[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13672
_____

D.C. Docket No. 1:09-cv-20756-PAS


CARLOS URQUILLA-DIAZ,
JUDE GILLESPIE,

Plaintiffs–Appellants,


BEN WILCOX,

Plaintiff,


versus


KAPLAN UNIVERSITY,
a.k.a. Iowa College Acquisition Corporation,
a.k.a. Kaplan College,
KAPLAN HIGHER EDUCATION CORPORATION,
a division of Kaplan, Inc.; wholly owned subsidiary of
The Washington Post Company,
KAPLAN, INC.,

Defendants–Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 11, 2015)

Before MARTIN and DUBINA, Circuit Judges, and RODGERS,[*] District Judge.

DUBINA, Circuit Judge:

In this consolidated qui tam action, three relators brought claims under the False Claims Act against an educational institution for falsely certifying to the government that it was in compliance with various federal statutes and regulations to receive financial-aid funds from the federal fisc. The district court ruled against the relators. After final judgment was entered, two relators appealed. Relator Carlos Urquilla-Diaz appeals from the district court's dismissal with prejudice of his claims under the False Claims Act against Defendants Kaplan University, Kaplan Higher Education Corp., and Kaplan, Inc. (Kaplan).[1] Relator Jude Gillespie appeals from the district court's grant of summary judgment to Kaplan on his claims under the False Claims Act as well as several other orders. After reviewing the record, reading the parties' briefs, and with the benefit of oral argument, we affirm the district court's judgment in part and reverse in part.

_____

[*] Honorable Margaret C. Rodgers, Chief Judge, United States District Court for the Northern District of Florida, sitting by designation.

[1] Kaplan University operates numerous online educational enterprises across the United States and is a wholly owned subsidiary of Kaplan Higher Education Corp., a division of Kaplan, Inc.

## I.  Legal Framework

## A.  Higher Education Act

Under Title IV of the Higher Education Act of 1965, the federal government operates a number of programs that disburse funds to students to help defray the costs of higher education.  20 U.S.C. §§ 1070–1099d.  These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, the William D. Ford Federal Direct Loan Program, and the Federal Perkins Loan.[2]  But these funds are only available to students who attend qualifying schools.

To be eligible to receive Title IV funds, a school must enter into a program participation agreement with the Department of Education.  *Id.* § 1094; *see also* 34 C.F.R. § 668.14(a)(1) (2010).[3]  In signing such an agreement, the school promises to comply with all federal statutes applicable to Title IV of the Higher Education Act and the regulations promulgated thereunder.  *See* § 1094; 34 C.F.R. § 668.14(b)(1).  The school must also meet a number of additional requirements. But once qualified, students who currently attend or plan to attend the school may apply to receive Title IV funds by completing the Free Application for Federal Student Aid.

Here, Diaz and Gillespie's claims relate to the following statutory, regulatory, and contractual requirements that Kaplan had to meet or comply with to be eligible to receive Title IV funds.

---

[2] 20 U.S.C. §§ 1070a, 1071–1087, 1087a–1087j, 1087aa–1087ii.

[3] Unless otherwise noted, all regulations cited are to those in effect in 2010.

*Accreditation.*  A school must be accredited.  34 C.F.R. § 600.4(a)(5)(i).[4]

This is equally true for a proprietary school[5] like Kaplan.  *Id.* § 600.5(a)(6).  While

the Department of Education does not directly accredit schools, "the Secretary of

Education approves accrediting agencies for different types of educational

programs, and these accrediting bodies set independent standards for

accreditation."  *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 707

(6th Cir. 2006).  Both Kaplan University and Kaplan Higher Education Corp. are

accredited by the Higher Learning Commission.

*The 90/10 rule.*  A proprietary school must agree that it will "derive not less

than ten percent of [its] revenues from sources other than funds provided under"

Title IV of the Higher Education Act.  § 1094(a)(24); 34 C.F.R. § 668.14(b)(16).

This is known as the "90/10 rule."

*Ban on recruitment-based incentive compensation.*  A school must agree that

it will not award recruiters "any commission, bonus, or other incentive payment

based directly or indirectly on success in securing enrollments."  § 1094(a)(20).  In

2002, the Department of Education's implementing regulations created several safe

harbors—"arrangements that an institution may carry out without violating" this

statute.  34 C.F.R. § 668.14(b)(22)(ii).  One such harbor shelters a school that pays

---

[4] The regulations define *accredited* as "[t]he status of public recognition that a nationally recognized accrediting agency grants to an institution or educational program that meets the agency's established requirements."  34 C.F.R. § 600.2.

[5] A "proprietary institution of higher education" is defined as an institution that, among other things, is not "a public or other nonprofit institution."  20 U.S.C. §§ 1001(a)(4), 1002(b)(1)(C); *see also* 34 C.F.R. § 600.5(a)(1).

"fixed compensation . . . as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." *Id.* § 668.14(b)(22)(ii)(A).

*Satisfactory progress.* When the events in the second amended complaint filed in this case allegedly occurred, the Department of Education's regulations obligated schools to review their students' academic progress at the end of each year. *Id.* § 668.34(d). For students "enrolled in a program of study of more than two academic years," Title IV eligibility beyond the second year partially depended on having made "satisfactory progress." *Id.* § 668.34(a). This meant they had to have "a grade point average of at least a 'C' or its equivalent[ ] or ha[ve] academic standing consistent with the institution's requirements for graduation" at the end of the second year. *Id.* § 668.34(b).

But students who failed to do so would not necessarily lose Title IV eligibility. Schools could "find that a student [wa]s making satisfactory progress" by determining the student's lackluster academic progress was the result of (1) "[t]he death of a relative," (2) "[a]n injury or illness," or (3) "[o]ther special circumstances." *Id.* § 668.34(c). Also, students who lost Title IV eligibility at the two-year checkpoint could later be found to be making satisfactory progress if "at the end of a subsequent grading period [they came] into compliance with the institutions requirements for graduation." *Id.* § 668.34(d).

*Section 504 of the Rehabilitation Act.* Educational institutions that receive federal funds, including under Title IV of the Higher Education Act, are prohibited

from discriminating against the individuals with disabilities. 29 U.S.C. § 794(a), (b)(2)(A), (b)(3)(A). In its 2004 program participation agreement, Kaplan agreed that it would "comply with . . . Section 504 of the Rehabilitation Act and the implementing regulations 34 C.F.R. Part 104 (barring discrimination on the basis of physical handicap)."

### B. False Claims Act

The False Claims Act enables private citizens to recover damages on behalf of the United States by filing a qui tam action against a person who

   (1)    knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]

   (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)–(2) (2006). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). Simply put, the "*sine qua non* of a False Claims Act violation" is the submission of a false claim to the government. *Id.* (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).

Even so, an educational institution can be found liable under § 3729(a)(2) for falsely certifying to the Department of Education in its program participation agreement that it will comply with federal law and regulations. To prevail under

6

what our sister circuits call a "false certification theory"—a theory of liability that we expressly adopt—the relator must prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006).[6]

## II. Factual and Procedural Background

### A. Diaz

Diaz worked for Kaplan University from August 2004 through April 2005 as a professor of paralegal studies. In April 2007, he filed this qui tam action against Kaplan. He then amended his complaint twice. In his second amended complaint, he alleged that Kaplan had violated several provisions of the Higher Education Act and its implementing regulations. These violations in turn rendered Kaplan ineligible to receive Title IV funds. And because these violations were committed with the requisite scienter, Kaplan was liable under the False Claims Act.

Specifically, Diaz alleged that Kaplan committed the following violations:

(1)    improperly paying incentive compensation to recruiters and then falsely asserting in a yearly letter that it was in compliance with the ban on recruitment-based incentive compensation;

---

[6] Congress amended the False Claims Act via the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, 123 Stat. 1617. In doing so, Congress changed the language of subsection (a)(2), replacing the phrase "to get a false or fraudulent claim paid or approved by the Government" with "material to a false or fraudulent claim." *Id.* § 4, 123 Stat. at 1621. We have held that this change applies retroactively to claims pending for payment on or after June 7, 2008. *Hopper v. Solvay Pharm. Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009). While we adopt the false-certification theory of liability for both pre- and post-FERA claims, *Hendow* was decided before FERA, and we have no occasion to consider whether FERA might alter the *Hendow* elements for post-FERA claims. *See infra* nn. 7, 8.

7

(2)     enrolling employees in its courses and paying their tuition from a company scholarship created with Title IV funds, thereby violating the 90/10 rule;

(3)     inflating students' grades and then certifying that they were making satisfactory academic progress; and

(4)     using falsified documents to obtain accreditation.

As a result, Diaz asserted that Kaplan violated subsections (a)(1) and (a)(2) of the False Claims Act.[7]

Kaplan moved to dismiss for failure to state a claim.  In granting its motion, the district court found that Diaz had failed to adequately plead a False Claims Act violation.  The court thus dismissed Diaz's claims with prejudice and declined to decide whether his claims were also barred by the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5).

After final judgment was entered, Diaz perfected this appeal.

## B.  Gillespie

### 1.  Jude Gillespie's Employment with Kaplan University

In April 2004, Gillespie, a licensed Florida attorney since 1992, began working for Kaplan University as an associate professor of paralegal studies.  In August, he was promoted to department chair.  Two months later, he informed Kaplan that he had a medical disorder and requested several accommodations.  His requests were granted.

---

[7] Although Diaz averred generally that Kaplan defrauded the government "from January 1, 1999, through the present [June 24, 2009]," he made no specific allegations in the second amended complaint about claims that were pending on or after June 7, 2008.  Thus, like the district court, we apply the prior version of the statute.  *See supra* n. 6.

8

Even so, in April 2005, Gillespie complained to Karen Ross, then an associate general counsel for Kaplan, Inc., that Kaplan's grievance policies violated section 504 the Rehabilitation Act and its implementing regulations. At that time, he indicated that he planned to file an administrative complaint with the Department of Education's Office of Civil Rights (the OCR). The next day he did. The following day, Kaplan fired him for job abandonment because he had refused to perform his job duties.

### 2. The Office of Civil Rights Proceedings

In October 2005, after investigating Gillespie's allegations against Kaplan, the OCR rejected his individual claims. The agency found that Kaplan did not discriminate or retaliate against him. It also found that Kaplan's policies did not prevent him from being "able to voice his grievances and to have them heard by every person at Kaplan he contacted."

But after reviewing the policies and procedures regarding disabled employees in the Kaplan Higher Education Corporation Employee Handbook, Kaplan Field Employee Handbook, and Kaplan University Faculty Handbook, the OCR made seven additional findings:

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.

- The non-harassment policy only addresses the types of harassment to which an employee might be subjected. As all discrimination does not necessarily rise to the level of harassment, the University needs to provide policies and procedures that address discrimination separately from harassment.

9

- The discrimination/harassment complaint procedure should be amended to provide the detailed process in which employees might seek informal and formal resolutions to their concerns.

- The University should designate consistently to whom informal [sic] and/or informal complaints may be addressed.

- The University's policies and procedures should be amended so as to provide a definite detailed manner and period of time in which prompt investigations are to be completed (30-60 days).

- The complaint procedures should be amended to require the University to notify complainants in writing of the results of investigations.

- The University's policies and procedures should provide where a complainant and/or one who has been accused may appeal the investigation's findings.

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.

That same month, Kaplan voluntarily entered into a resolution agreement with the OCR to change its policies. In doing so, Kaplan did not admit to any violation of or noncompliance with section 504 of the Rehabilitation Act or its implementing regulations.

Over the next several months, Kaplan communicated with the OCR as it worked to comply with the terms of the resolution agreement. In May 2007, the agency sent Kaplan a compliance letter stating that no further monitoring was necessary because it had fulfilled its obligations under the resolution agreement. At no time did the agency revoke Kaplan's eligibility to receive Title IV funds.

10

### 3. Gillespie's Complaints

In April 2007, Gillespie filed this qui tam action against Kaplan. He then amended his complaint twice. In the second amended complaint, he alleged that Kaplan violated the False Claims Act by knowingly (1) submitting false claims for payment to the government, and (2) making false statements that led to false claims for payment from the government. Specifically, he alleged that Kaplan made false statements in its 2004 and 2007 program participation agreements when it certified that it would "comply with . . . Section 504 of the Rehabilitation Act and the implementing regulations 34 C.F.R. Part 104 (barring discrimination on the basis of physical handicap)."

In August 2011, the district court dismissed with prejudice Gillespie's claim that Kaplan continued to violate the Rehabilitation Act after May 2007. The court found that Gillespie had not alleged with particularity any ongoing violations. Indeed, the court noted that the May 2007 letter from the OCR to Kaplan—the same letter that Gillespie says proves that Kaplan was noncompliant in the first place—established that Kaplan complied with the terms of the resolution agreement, thereby ending any noncompliance under the Rehabilitation Act and its implementing regulations.[8]

---

[8] Gillespie moved for leave to file a third amended complaint to expand the temporal reach of his claim beyond May 2007. The district court denied this request as well as his motion for reconsideration. Once again, the court explained that Gillespie had made no specific allegations of continuing violations. The court also noted that the public-disclosure rule barred him from relying upon documents received through a Freedom of Information Act request because he was not their original source.

On appeal, Gillespie mentions both the order dismissing his claim about Kaplan's alleged post–May 2007 violations and the order denying leave to amend. But his brief pays these orders scant attention. At no point, does he discuss why the dismissal of his claims was error or how

11

## 4. The 2004 Program Participation Agreement and Kaplan's Compliance with the Rehabilitation Act

The 2004 program participation agreement at the center of Gillespie's False Claims Act action against Kaplan was signed by Gary Kerber, the president and chief executive officer of Kaplan Higher Education Corp. at that time.  Kerber testified that he signed this agreement in reliance upon the opinions of his subordinates, including those charged with compliance.  One such person was Karen Ross.

Kaplan hired Ross as vice president of human resources and associate general counsel in 2002.  Two years later, she was promoted to senior vice-president of human resources and associate general counsel.  Although she was not responsible for ensuring that Kaplan was eligible to receive Title IV funds, she knew that someone in the general counsel's office was.  Instead, her responsibilities included ensuring that Kaplan's policies complied with the Rehabilitation Act and its implementing regulations as well as providing nondiscrimination training.  Additional compliance training at Kaplan included interactive computer programs that provided nondiscrimination training for all

---

the denial of leave to amend was an abuse of discretion.  *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (holding that a dismissal with prejudice is reviewed de novo); *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1178 (11th Cir. 2013) (holding that a denial of leave to amend is reviewed for abuse of discretion).  In any event, to the extent that he has not waived these issues, *see Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014), we conclude from the record that the district court neither erred nor abused its discretion.

Also, because the district court limited the temporal reach of Gillespie's claims to May 2007—and this decision was not error—the FERA amendments are inapplicable.  *See supra* n.6.

employees, annual meetings for human-resource directors, and annual managers' meetings.

In 2003, Ross revised Kaplan's employee handbook, incorporating nondiscrimination policies and grievance procedures that the Equal Employment Opportunity Commission had approved for use by a prior employer. The revised handbook covered nondiscrimination based on disability and included grievance procedures. According to her testimony, she believed that the revised handbook—that was sent to various Kaplan entities for use as a template—contained policies that complied with all of Kaplan's legal requirements. No one ever told her that these policies might not comport with federal law or regulations until Gillespie did so the day before he filed an administrative complaint with the OCR in April 2005.

### 5. The Privilege-Log Dispute

After the district court dismissed Gillespie's continuing-violation claim, discovery commenced and proceeded for the next 15 months. During that period, Gillespie took 8 depositions, served 43 interrogatories, and made 29 requests for production. All told, Kaplan produced more than 18,000 pages of responsive documents.

After discovery closed, but before the parties began briefing on summary judgment, Gillespie requested a discovery conference with the magistrate judge. At the February 2013 hearing, Gillespie requested *in camera* review of about 60 documents that, in his view, gave him the "best shot" of showing that Kaplan had improperly designated documents as privileged.

13

On July 12, 2013, after considering the parties' briefs on the issue, the magistrate judge ruled that Kaplan had improperly withheld six documents (three of which were duplicates) and ordered Kaplan to produce the four wrongly withheld documents.  Despite this ruling, Gillespie never sought review of any other documents designated as privileged.

### 6.  Summary Judgment Proceedings

After discovery closed and the privilege dispute had been briefed, Kaplan and Gillespie each moved for summary judgment.  Although the privilege dispute was then unresolved, Gillespie made no mention of it in his briefs, nor did he bring it to the district court's attention in any other manner.  Instead, he requested that the court decide the motions on the then-current record.

On July 15, 2013, just two business days after Kaplan was ordered to produce the four wrongly withheld documents, the district court granted summary judgment to Kaplan.  The court concluded that Gillespie had not raised a genuine issue of material fact regarding scienter because "Kaplan had policies and procedures in place to ensure compliance and there [wa]s no evidence that those policies and procedures were not followed." *United States ex rel. Gillespie v. Kaplan Univ.* (*Gillespie I*), No. 09-20756-civ, 2013 WL 3762445, at *6 (S.D. Fla. July 16, 2013).  The court noted that Kaplan had relied on counsel, including Karen Ross, who "made a point of staying on top of developments in the labor and employment law fields" and had modeled Kaplan's policies after an example

14

previously approved by the EEOC, in creating the policies that allegedly violated the Rehabilitation Act and its implementing regulations. *Id.*

Additionally, the district court rejected Gillespie's assertion that Ross had drafted Kaplan's policies without considering the Rehabilitation Act, explaining that he had taken her statements "out of context." *Id.* at \*8. The court emphasized the undisputed evidence showing that Kaplan "took steps to ensure compliance." *Id.* at \*7. Thus, because Gillespie had not established a jury question regarding scienter, the court granted summary judgment to Kaplan.

### 7. Gillespie's Motions to Abate and to Reconsider

Gillespie then filed a motion to abate entry of final judgment and a motion to reconsider. In his motion to abate, he asserted that the district court had entered summary judgment prematurely given that the privilege dispute had been resolved only two business days earlier and the documents ordered to be produced "could have potentially led [him] to alert the [c]ourt that further discovery may impact the pending summary judgment briefing." In his motion to reconsider, he contended that the district court had made a number of errors in assessing and characterizing the record.

The district court denied both motions. It pointed out that Gillespie had failed to notify the court that the outstanding discovery was relevant to the parties' pending summary-judgment motions. For this reason, his motion to abate appeared to be "nothing more than an attempt at a second bite at the apple." *United States ex rel. Gillespie v. Kaplan Univ.* (*Gillespie II*), No. 09-20756-civ,

15

2013 WL 6492830, at *1 (S.D. Fla. Dec. 10, 2013). While the court could have denied the motion for this reason alone, it did not. After reviewing the four documents that Kaplan was ordered to produce, the court concluded that they did "not contain any information relevant to the scienter issue" and thus "had no effect on the entry of summary judgment." *Id.* Additionally, the court found no basis for reconsideration because Gillespie "simply raised the same arguments he previously made" and had "not shown that the undisputed facts are disputed." *Id.* at *2.

Gillespie now appeals from the district court's grant of summary judgment to Kaplan and all related orders.

### III. Standards of Review

Several standards of review govern this appeal. We review a dismissal with prejudice for failure to state a claim under the False Claims Act de novo. *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009). In doing so, we accept the allegations in the complaint as true and construe them along with the reasonable inferences therefrom in the relator's favor. *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).

We review the district court's grant of summary judgment de novo, construing the evidence and all reasonable inferences therefrom in favor of the nonmoving party. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and the like "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

16

R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 322, 106 S. Ct. 2548, 2552 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004) (internal citations omitted)) (internal quotation marks omitted). Thus, to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

We review a district court's decision to rule on a summary-judgment motion before all discovery disputes have been resolved for abuse of discretion. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1219 (11th Cir. 2000). In doing so, we consider whether the nonmoving party can show "substantial harm" from the court's decision, *see id.*, and whether the nonmoving party timely informed the district court of any outstanding discovery, *see Cowan v. J.C. Penney Co.*, 790 F.2d 1529, 1530 (11th Cir. 1986). Moreover, the nonmoving party "must specifically demonstrate how postponement of a ruling on the motion [would have] enable[d] him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843 (11th Cir. 1989) (quoting *Wallace v. Brownell Pontiac–GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983)) (quotation marks omitted).

17

## IV. Discussion

## A. Diaz

On appeal, Diaz contends that the allegations in the second amended complaint, when taken as true and viewed holistically, adequately state a claim for relief under § 3729(a)(1) and (a)(2). The district court disagreed and dismissed his claims with prejudice. Because we partially agree, the district court's judgment will be affirmed in part and reversed in part.

### 1. Pleading a Claim for Relief Under the False Claims Act

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the plaintiff's allegations need not satisfy any "technical form," they "must be simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). Rule 8's pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007)).

Where the allegations are merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," the plaintiff's claim will not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Twombly,* 550 U.S. at 555, 127 S. Ct. at 1965. For the claim to survive, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678, 129 S.

18

Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570, 127 S. Ct. at 1974). A claim is facially plausible where the facts alleged permit the court to reasonably infer that the defendant's alleged misconduct was unlawful. *Id.*, 129 S. Ct. at 1949. Factual allegations that are "'merely consistent with' a defendant's liability," however, are not facially plausible. *Id.*, 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557, 127 S. Ct. at 1966); *see also Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). *See Clausen*, 290 F.3d at 1309. Rule 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud" but may allege scienter generally. To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* (quoting *Cooper*, 19 F.3d at 567–68) (internal quotation marks omitted).

The mere disregard of federal regulations or improper internal practices does not create liability under § 3729(a)(1) "unless, as a result of such acts, the [defendant] knowingly ask[ed] the Government to pay amounts it does not owe." *Id.* at 1311. Indeed, the "central question" regarding whether a relator's allegations state a claim under this subsection is, did the defendant present (or caused to be presented ) to the government a false or fraudulent claim for payment? *Hopper*, 588 F.3d at 1326. So to satisfy Rule 9(b)'s heightened-pleading requirements, the

19

relator must allege the "actual presentment of a claim . . . with particularity," *id.* at 1327, meaning particular facts about "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," *Corsello*, 428 F.3d at 1014.

In contrast, § 3729(a)(2) "does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government." *Hopper*, 588 F.3d at 1327. Even so, to state a claim under this subsection, we have held "that a plaintiff must show that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Id.*

Additionally, our caselaw is clear: "the submission of a false claim is the '*sine qua non* of a False Claims Act violation.'" *Id.* at 1328 (quoting *Clausen*, 290 F.3d at 1311). And while § 3729(a)(2) does not require the false claim's actual presentment to the government for payment, it also does not "impose liability for false statements [unless they] actually cause the government to pay amounts it does not owe." *Id.* So to prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim. *Id.* at 1329. For this reason, to satisfy Rule 9(b)'s heightened-pleading requirements, the relator has to allege with particularity that the defendant's "false statements ultimately led the government to pay amounts it did not owe." *Id.*

Here, Diaz argues that he adequately pleaded a False Claims Act violation under a false certification theory.  To do so under this theory, he had to allege facts that, if true, would show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Hendow*, 461 F.3d at 1174.  After all, "[m]ere regulatory violations do not give rise to a viable FCA action"; instead, "[i]t is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."  *Id.* at 1171 (alterations in original) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996)).  Thus, "the relevant certification of compliance must be both a 'prerequisite to obtaining a government benefit," and a '*sine qua non* of receipt of [government] funding.'"  *Id.* at 1172 (alteration in original) (quoting *Anton*, 91 F.3d at 1266, 1267) (internal citation omitted).

### i.  Incentive Compensation

Diaz alleged that despite its certifications of compliance with the Higher Education Act's ban on recruitment-based incentive compensation, Kaplan violated this ban by paying its recruiters retention bonuses, cash bonuses, trips, or salaries based on the number of students they enrolled.[9]  *See* 20 U.S.C. § 1094(a)(20).  Because Diaz alleged that factors other than recruitment were

---

[9] Diaz stated that these violations started in 1999 and continued until 2009, but his complaint only references employees who allegedly received recruitment-based compensation during 2004 through 2009.  For this reason, we limit our consideration of his claim that Kaplan violated the False Claims Act by falsely certifying its compliance with the incentive-compensation ban to these years.

21

formally a part of Kaplan's compensation policy but failed not only to identify those factors but also to plead "any allegations, other than bare conclusions, to show that the other factors that were part of the compensation plan were not actually considered in practice," the district court concluded that he had not stated a claim under the False Claims Act. *United States ex rel. Diaz v. Kaplan Univ.*, No. 09-20756-civ, 2011 WL 3627285, at *5 (S.D. Fla. Aug. 17, 2011). We disagree.

We begin by noting that during the relevant period (2004 through 2009) the Department of Education's regulations implementing the incentive-compensation ban included a number of safe harbors.[10] One such safe harbor sheltered schools that paid "fixed compensation . . . as long as that compensation [wa]s not adjusted up or down more than twice during any twelve month period, and any adjustment [wa]s not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added). In promulgating this safe harbor, the Department of Education made clear that "the word 'solely' [wa]s being used in its dictionary definition." Federal Student Aid Programs, 67 Fed. Reg. at 67,055.[11] That is, "without another" or "to the exclusion of all else." *Webster's Ninth New Collegiate Dictionary* 1122 (1986).

---

[10] *See* Department of Education, Federal Student Aid Programs, 67 Fed. Reg. 67,048, 67,054 (Nov. 1, 2002) ("We believe that the primary purpose of the regulatory safe harbors is to provide guidance to institutions so they may adopt compensation arrangements that do not run afoul of the incentive compensation provision in section 487(a)(2) of the [Higher Education Act].").

[11] This and other safe harbors were eliminated effective July 2011. Department of Education, Program Integrity Issues, 75 Fed. Reg. 66,832, 66,832 (Oct. 29, 2010).

To be sure, Diaz did not allege that Kaplan's recruiters were paid solely on enrollments. But he did allege that their compensation was "based primarily on the number of students recruited." He also alleged that while "the official compensation plan looked like there were other factors besides the number of enrollments, it was nothing more than a disguised plan to pay unlawful compensation to the recruiters." These factors included professionalism, attendance, mentoring, participation in new initiatives, and willingness to work late shifts.[12] In short, Diaz alleged that the nonrecruitment factors only existed on paper; the real basis on which recruiters received raises was enrollments.

---

[12] Although Diaz's complaint does not identify these factors, he did attach a copy of Kaplan's compensation plan for admissions advisors (i.e., recruiters) to his brief in opposition to Kaplan's motion to dismiss. *See* Doc. 181-4. This document identifies the other compensation factors that were at least formally part of the compensation plan.

Typically, a Rule 12(b)(6) motion to dismiss must be decided without considering matters outside of or unattached to the complaint. *See Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002); *Homart Dev. Co. v. Sigman*, 868 F.2d 1556, 1562 (11th Cir. 1989). So when the court considers an extrinsic document, it must generally convert the motion to dismiss into one for summary judgment. Fed. R. Civ. P. 12(d); *Trustmark Ins.*, 299 F.3d at 1267. But conversion is not always required. In ruling on a motion to dismiss, the court may consider an extrinsic document if (1) it is central to a claim in the complaint, and (2) its authenticity is unchallenged. *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

Here, Kaplan's compensation plan is central to Diaz's claim that Kaplan violated the incentive-compensation ban and neither side challenges its authenticity—indeed, Kaplan cites this document as the source of its list of factors other than enrollments that were part of the decision to increase the pay of its admissions advisors. Thus, because the district court could have considered the contents of this document without converting Kaplan's motion to dismiss into one for summary judgment, we may also do so on appeal. *Cf. Harris v. Ivax Corp.*, 182 F.3d 802 n.2 (11th Cir. 1999) (explaining that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute").

23

On appeal, Diaz argues that the relevant question is how Kaplan implemented its compensation policy, not the terms of its policy. And he is correct. In response, Kaplan contends that his allegations failed to state a claim under the False Claims Act because he offered no specific facts from which it could be inferred that the nonrecruitment factors were merely pretextual. Based on our review of the record, we conclude that this contention fails for two reasons.

First, contrary to Kaplan's contention, Diaz included specific facts about four former Kaplan employees "whose salaries were increased or decreased based on the number of enrollments." He alleged:

- Dave Schienberg in Florida [was employed for approximately 19 months at Kaplan, from 2006-2008]. His pay rose from $29,000 a year to $50,000; when he was unable to meet the higher quota that came with the higher pay, he was terminated. . . .

- Paris Henderson was employed from approximately 2005-2008. He is another employee who was paid based on the number of enrollments he obtained. He was ultimately terminated for not meeting the increased requirements.

- Justin Keyes worked for Kaplan from 2006-2008. His pay started at $30,000 and rose to $60,000 based on the number of enrollments he obtained. When his enrollment numbers dropped, so did his salary, as it was reduced to $37,000. When he was not able to increase the number of enrollments to the higher, required levels, he was terminated.

- Mark Anthony Edwards . . . worked as a recruiter for Kaplan for about five years, ending April 10, 2009. His starting salary was approximately $26,000. It was increased to approximately $60,000 based on the number of students he enrolled. His salary was reduced back to $30,000 when he could not maintain higher levels of new enrollments.

24

Accepting these allegations as true and drawing all reasonable inferences therefrom in Diaz's favor, as we must in reviewing the ruling on Kaplan's motion to dismiss, *McNutt*, 423 F.3d at 1259, we conclude that Diaz's failure to include the adverb *solely*—a word with no talismanic power—is not enough to preclude the inference that he pleaded a plausible violation of the False Claims Act.

Second, despite Kaplan's contrary contention, this inference is not foreclosed by the fact that the compensation policy in the record included nonrecruitment factors. That is because the policy was not in place during the entire period covered by Diaz's allegations: 2004 to 2009. The policy is dated "5/26/06." So at least for the recruiters who worked for Kaplan before this date and received raises "based on" their enrollment numbers, it is not unreasonable to infer that these raises were based solely on enrollments. Diaz thus plausibly stated a claim under the False Claims Act based on Kaplan's alleged violations of the incentive-compensation ban that relate to these recruiters. Accordingly, we reverse the district court's judgment dismissing Diaz's claim insofar as it was based on Kaplan's alleged violation of the incentive-compensation ban.[13]

---

[13] On appeal, Kaplan contends that the dismissal of Diaz's claims could be upheld on two additional grounds: failure to adequately plead scienter and failure to plead the submission of a false claim. Neither ground has any merit. First, to satisfy Rule 9(b), a relator may plead scienter generally, and Diaz did so. Second, we have said that "in the appropriate case, we may consider whether the particularity requirements of Rule 9(b), as to the details of the alleged false claims at issue, are more relaxed for claims under 31 U.S.C. § 3729(a)(2) than for claims under § 3729(a)(1)." *Hopper*, 588 F.3d at 1329. Here, however, we need not reach this question because Diaz has provided specific allegations about three students who applied for and received Title IV funds to attend classes at Kaplan—after Kaplan allegedly "knowingly" violated the incentive-compensation ban.

## ii.  Grade Inflation

Diaz alleged that Kaplan violated the Department of Education's regulation requiring students seeking Title IV funds beyond their second year of study to have made "satisfactory progress" (as defined in 34 C.F.R. § 668.34) by engaging in a grade-inflation scheme.  Grade inflation could lead to a False Claims Act violation where, among other things, a school certified that a student was making satisfactory progress when he or she was not, thus causing the government to disburse Title IV funds that were not actually owed to the student.  Because Diaz had not adequately alleged how Kaplan's grade-inflation scheme resulted in the school falsely certifying that students were maintaining satisfactory progress, the district court concluded that he had failed to state a claim under the False Claims Act.  We agree.

While Diaz offered some particulars about Kaplan's alleged grade-inflation scheme, he failed to plead with particularity how this scheme led to students being falsely certified as making satisfactory progress.  That is, he did not make any specific allegations of students who would not have been making satisfactory progress without grade inflation.  Nor did he allege that Kaplan's grading policy precluded students from failing regardless of how poorly they performed.  Quite the contrary: he alleged that some students flunked out.  Additionally, because he included no allegations about Kaplan's graduation requirements, it is impossible to plausibly infer that the students were not making satisfactory progress consistent with these requirements but for Kaplan's alleged grade-inflation scheme.

26

In short, to state a claim under the False Claims Act, Diaz needed to allege with particularity that some students would not have been making satisfactory progress—and thus Kaplan's certifications to this effect were false—*but for* the school's grade-inflation scheme. He did not. We thus conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the satisfactory-progress regulation.

### iii. The 90/10 Rule

Diaz averred that Kaplan violated the 90/10 rule by creating a scholarship program for its employees with money from its students' tuition payments, which in turn may have come from Title IV funds. For a school to lose its eligibility to receive Title IV funds, it must derive "less than ten percent of [its] revenues from sources other than" Title IV funds for "two consecutive institutional fiscal years." 20 U.S.C. § 1094(a)(24), (d)(2). Because Diaz had not adequately alleged how Kaplan's Gift of Knowledge scholarship violated the 90/10 rule, the district court concluded that he failed to state a claim under the False Claims Act. Again, we agree.

Diaz did not allege with particularity that Kaplan received more than 90 percent of its revenue from Title IV funds or that it received less than 10 percent of its revenue from non-Title IV funds. Instead, he alleged that Kaplan endowed the Gift of Knowledge scholarship with some unspecified amount of Title IV funds from the tuition payments of its students. But even if true, absent allegations about Kaplan's total revenue, this fact alone does not make it plausible (as opposed to

27

merely possible) that the school violated the 90/10 rule. *See Chaparro*, 693 F.3d at 1337.

Diaz alleged that (1) "almost 100% of Kaplan money is taken in from federal student loans"; and (2) "Kaplan would in fact use creative accounting techniques to indicate that Kaplan was receiving that cash [payments from the Gift of Knowledge scholarship fund] from the students when it was not." But these general statements were unsupported by any specific factual allegations and thus failed to satisfy his burden to plead a False Claims Act violation with particularity under Rule 9(b). *See Clausen*, 290 F.3d at 1314 n.25 (noting that Rule 9(b)'s pleading requirements might be relaxed only if the relator has adequately "allege[d] at least some examples of actual false claims to lay a complete foundation for the rest of his allegations").

In sum, Diaz failed to allege facts that, if true, would establish that Kaplan's certification of compliance with the 90/10 rule was false. At most, his allegations were merely consistent with Kaplan having violated this rule, but that is not enough to state a claim under the False Claims Act. Thus, we conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the 90/10 rule.

### iv. Accreditation

Diaz alleged that Kaplan submitted backdated studies and budgets as well as other "forged" or "false" documents to the Higher Learning Commission, the agency that accredited "certain" of its "college degree programs." In his view,

28

"without the falsified documents, [Kaplan] would not [have] receive[d] the accreditation it desired."  Making false statements to an accreditation agency could lead to a False Claims Act violation because whether a school is accredited is material to the government's decision to disburse Title IV funds to the school (or its students).  Because Diaz failed to allege with particularity what false statements were made, when they were made, or who made them, the district court concluded that he had failed to state a claim under the False Claims Act.  Here, too, we agree.

Making false statements to an accreditation agency does not expose a school to liability under § 3729(a)(2) unless the statements were essential to the school having received (or maintained) its accreditation.  For while lying to an accreditation agency is a reprehensible business practice, it violates the False Claims Act only if the "false statements ultimately led the government to pay amounts it did not owe."  *Hopper*, 588 F.3d at 1329.  Thus, to survive the motion to dismiss, Diaz had to plead particular facts that provide a plausible connection between Kaplan's allegedly false statements to the Higher Learning Commission and the agency's decision to accredit "certain college degree programs."  Because he failed to do so, we conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the accreditation requirement.

## 2.  Dismissal with Prejudice

Diaz contends that the district court was wrong to dismiss his claims with prejudice because the government is the real party in interest in a False Claims Act

action.  He asserts that if this judgment is left in place, Kaplan could conceivably argue that res judicata bars the government from bringing a properly pleaded False Claims Act action.  Here, however, we need not decide whether a Rule 12(b)(6) dismissal precludes the government (or another relator) from bringing a False Claims Act action against a defendant, especially where the government did not intervene at any stage in the proceedings, to affirm the dismissal with prejudice of Diaz's claims.  Three attempts at proper pleading are enough.[14]  That said, we modify the judgment of dismissal to be without prejudice to the government.  *Cf. United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 456 (5th Cir. 2005).

## B.  Gillespie

The district court granted summary judgment to Kaplan because Gillespie failed to show that there was a genuine issue of material fact regarding scienter—a necessary element of his false certification claim.  *See Hendow*, 461 F.3d at 1174.  Specifically, the court found that nothing in the record supported his contention that Kaplan knew or should have known that its policies violated section 504 of the Rehabilitation Act and its implementing regulations when the 2004 program

---

[14] Diaz does not specifically argue in his briefs that the district court abused its discretion by failing to grant him leave to amend his complaint.  Thus, to the extent that he has not waived this argument on appeal, *see Sapuppo*, 739 F.3d at 681, we conclude from the record that the district court did not.  Diaz never made a motion to amend his complaint, nor did he ever suggest how he could cure his defective complaint in a subsequent pleading.  Under our precedent, the district court's decision was not an abuse of discretion.  *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1362 (11th Cir. 2006) (holding that denial of leave to amend was not an abuse of discretion where the relator "failed to include the proposed amendment or the substance thereof" with his request).

participation agreement was executed.  On appeal, Gillespie contends that the district court's finding was erroneous for four reasons.

*First*, Gillespie told Karen Ross that the company's policies did not comply with the Rehabilitation Act and its implementing regulations in April 2005.

*Second*, Ross drafted Kaplan's nondiscrimination policies and grievance procedures to comply with the Rehabilitation Act from language that she had used at a previous employer to comply with the EEOC's regulations—even though that company did not receive federal funds and thus was not subject to the Rehabilitation Act.

*Third*, Gary Kerber, who signed the 2004 program participation agreement for Kaplan, did not personally ensure that the company's nondiscrimination policies and grievance procedures complied with the Rehabilitation Act.

*Fourth*, Kaplan could not have entered into a voluntary restoration agreement with the OCR unless it was in noncompliance with the Rehabilitation Act.

Kaplan responds that even when viewed collectively, this evidence does not create a jury question about whether it acted with actual knowledge or the aggravated form of gross negligence needed to show scienter under the False Claims Act.  Because we agree, the district court's grant of summary judgment to Kaplan will be affirmed.

### 1.  Scienter Under the False Claims Act

The False Claims Act's scienter requirement is "actually quite nuanced." *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013).  For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard."  § 3729(b).  Although proof of a "specific intent to defraud" is not

31

required, *id.*, the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence, *King-Vassel*, 728 F.3d at 712.

Congress added the "reckless disregard" provision to the False Claims Act in 1986.  *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012).  The Senate Report accompanying this change states that this language was added to ensure that "knowingly" captured "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S. Rep. 99-345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286.  Liability attaches to "[o]nly those who act in gross negligence"—those who fail "to make such inquiry as would be reasonable and prudent to conduct under the circumstances."  *Id.* at 20 (quotation marks omitted).  In other words, Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, *see Raysdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n.1 (11th Cir. 1999), "into a vehicle either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence'' or imposing 'a burdensome obligation' on government contractors rather than a 'limited duty to inquire,'" *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (quoting S. Rep. 99-345, at 6, 19).

Our sister circuits have uniformly described *reckless disregard* for purposes of the False Claims Act as akin to "an extension of gross negligence" or an "extreme version of ordinary negligence."  *See, e.g.*, *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *United States ex rel. Farmer v. City of Houston*,

32

523 F.3d 333, 338 & n.9 (5th Cir. 2008). Indeed, as the Seventh Circuit recently noted, this description is consistent with *Black's* definition that "a person acts with reckless disregard 'when the actor knows or has reason to know of facts that would lead a reasonable person to realize' that harm is the likely result of the relevant act." *King-Vassel*, 728 F.3d at 713 (quoting *Black's Law Dictionary* 540–41 (9th ed. 2009)).[15]

On appeal, Gillespie contends that a jury could reasonably conclude from the record evidence that Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with either actual knowledge that it was not or with reckless disregard for whether this certification was true. We disagree and reject his contentions for the following reasons.

### i. Actual Knowledge

Gillespie identifies nothing in the record that would allow a reasonable jury to conclude that Kaplan entered into the 2004 program participation agreement with actual knowledge that its policies violated section 504 of the Rehabilitation Act and its implementing regulations. And his attempt to manufacture a triable issue out of a misstatement in the district court's summary-judgment order is unavailing.

---

[15] The parties do not cite, nor was our research able to find, a case discussing the meaning of *deliberate ignorance*. Even so, this scienter requirement plainly demands even more culpability than that needed to constitute reckless disregard. Because Gillespie has not adduced evidence that raises a jury question about whether Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with reckless disregard for the truth, it follows *a fortiori* that he has not shown that a triable question remains regarding whether Kaplan's compliance certification was made with deliberate ignorance.

33

Gillespie objects to the district court's framing of this fact: "No one ever told Ross that her policies might not comport with federal law." *Gillespie I*, 2013 WL 3762445, at *3. As the court later acknowledged in its order denying his motions to abate and reconsider, this sentence should have stated: "No one, other than [Gillespie] just before he filed his OCR complaint, told Ross that her policies might not comport with federal law." *Gillespie II*, 2013 WL 6492830, at *2 n.3. Even so, the district court concluded that neither abatement nor reconsideration was warranted because "this change is immaterial to the outcome because it does not show that Ross was aware that the policies might not comply with federal law at the time Kaplan entered into the [program participation agreement] at issue." *Id.*

On appeal, Gillespie ignores the district court's conclusion that this change was immaterial to whether a jury question exists about scienter. Instead, he contends that the district court resolved its mistake by switching the misstated fact from material to immaterial. But a fair reading of the order denying abatement and reconsideration makes clear that nothing could be further from the truth.

More importantly, Gillespie does not explain how his April 2005 complaint to Ross would allow a reasonable jury to conclude that Kaplan executed the 2004 program participation agreement with actual knowledge that its policies were unlawful. Hence, we conclude that the district court did not err in finding that Gillespie failed to show that a genuine issue of material fact remained regarding the actual-knowledge aspect of scienter.

34

### ii. Reckless Disregard

Gillespie also fails to identify anything in the record that would allow a reasonable jury to conclude that Kaplan executed the 2004 program participation agreement with reckless disregard for whether its policies violated section 504 of the Rehabilitation Act or its implementing regulations. And his effort to generate a jury question through his personal, hypercritical assessments of Karen Ross and Gary Kerber's job performance—assessments untethered from any binding or persuasive authority—fails.

### a. Karen Ross

According to Gillespie, the record contains admissible evidence that calls into question whether Karen Ross, the author of the policies at issue, was up to date on the relevant legal issues concerning the Rehabilitation Act. Put simply, he posits that she was not. To support this position, Gillespie leans heavily on the following facts about Ross:

(1)    She drafted Kaplan's nondiscrimination policies and grievance procedures in 2003 based on those of a former employer—a retail-brokerage firm concerned with complying with the EEOC's regulations and that was not subject to the Rehabilitation Act.

(2)    She admitted in her deposition that she had never heard of a program participation agreement—the document with which Kaplan had to comply to be eligible to receive Title IV funds.

(3)    She could not recall having checked with anyone about whether the policies she drafted complied with federal law and regulations.

(4)    She could not recall whether she read the Rehabilitation Act right before drafting Kaplan's policies.

35

(5)    She could not recall a specific time when she had read the Rehabilitation Act after 1983, but she testified that she would have done so if an employee dispute had arisen.

(6)    She could recall working for only one employer subject to the Rehabilitation Act (in the late-1980s) before joining Kaplan in 2002.

(7)    She did not testify that she had ever read or was even familiar with the regulations implementing the Rehabilitation Act— even though the district court found that she was familiar with both the Act and its regulations.

Based on these facts, Gillespie posits that a jury could reasonably conclude that Ross was not up to date on the Rehabilitation Act and thus did not have the skill or experience necessary to draft Kaplan's nondiscrimination policies and grievance policies. In his view, the district court's contrary conclusion was possible only by impermissibly weighing the evidence or assessing the credibility of the evidence and testimony. Neither theory has any merit.

To begin, Gillespie notes that Ross was unfamiliar with the requirements that educational institutions must meet to be eligible to receive Title IV funds (e.g., what a program participation agreement was). But he does not explain why this knowledge (or lack thereof) is material to whether Kaplan acted with reckless disregard. Nor is one readily apparent. Thus, these facts are immaterial. *See Harrison*, 746 F.3d at 1298.

Next, Gillespie repeatedly emphasizes three facts: first, Ross revised Kaplan's polices based on those of a former employer that were designed to satisfy the EEOC's regulations; second, Ross could not recall having specifically read the Rehabilitation Act since 1983; and third, Ross's deposition testimony is devoid of

36

any indication that she had read or was familiar with the Rehabilitation Act's implementing regulations.  Admittedly, at first blush these facts smack of incompetence.  But this is only because they have been presented without any factual or legal context.

First, the factual context.  When Ross joined Kaplan in 2002, she had been practicing employment law for over twenty years.  Her uncontroverted testimony was that during this time she stayed current on employment-law issues by regularly reading case summaries in the daily labor report and attending continuing-education classes.  She also testified that she had read and was familiar with the Rehabilitation Act, though she could not recall having done so before revising Kaplan's policies.

Second, the legal context.  From the tenor of Gillespie's brief, one might infer that the Department of Education's regulations implementing section 504 of the Rehabilitation Act are a world apart from those promulgated by the EEOC to implement nondiscrimination legislation such as the Americans with Disability Act of 1990.  After all, what else could account for his attempt to make hay of the fact that Ross modeled Kaplan's policies after those designed to comply with the EEOC's regulations?  We are left to guess, however, because Gillespie offers neither reference nor reason to support this implicit argument.

Yet this much is clear: Congress looked to the Rehabilitation Act in enacting the ADA.  *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1237 (11th Cir. 2005).  So Gillespie's contention that a jury question about scienter exists cannot merely rest on the fact that Ross modeled Kaplan's policies after those that

37

complied with the regulations implementing the ADA.  Instead, he had to point to record evidence that would enable a reasonable jury to find that under the circumstances Ross's conduct was either seriously unreasonable or imprudent—akin to gross negligence—or that she knew or reasonably should have known that relying on disability policies and procedures approved by the EEOC would likely lead to Kaplan violating the Rehabilitation Act and its implementing regulations. *See King-Vassel*, 728 F.3d at 712–13.  He did neither.  Thus, these facts are immaterial.  *See Harrison*, 746 F.3d at 1298.

Finally, Gillespie's attempt to turn nothing (the absence of evidence that Ross had read and was familiar with the Rehabilitation Act's implementing regulations) into something (evidence of Kaplan's reckless disregard) falls flat.  To survive Kaplan's motion for summary judgment, Gillespie had to point to record evidence that would permit a reasonable jury to find in his favor.  *See Brooks*, 446 F.3d at 1162.  Having determined that the record evidence that he identifies is immaterial, we cannot conclude that the district court's grant of summary judgment to Kaplan should be reversed based on an absence of evidence, especially where the hole in the record exists because Gillespie did not ask Ross about the implementing regulations during her deposition.

At bottom, even if Gillespie's personal assessment that Ross should have performed her job better were true, this would not establish a jury question about whether Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with reckless disregard for the truth.  *See Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (11th Cir. 1992) (holding relator's own affidavit

criticizing his employer's performance was not evidence that the employer acted with the requisite intent to be found liable under the False Claims Act).

Finally, because Gillespie emphasizes facts about Ross that are immaterial, we conclude that his assertion that the district court impermissibly weighed the evidence or made credibility determinations is without merit.

### b. Gary Kerber

Gillespie also takes issue with the fact that Gary Kerber signed the 2004 program participation agreement without independently and specifically verifying that Kaplan's policies complied with the Rehabilitation Act and its implementing regulations. Indeed, in Gillespie's view, the district court's finding that Kerber was "very on board" with meeting these requirements, *see Gillespie I*, 2013 WL 3762445, at *3, is contradicted (or at least called into question) by Kerber's own testimony that he did nothing to independently verify the accuracy of Kaplan's representations in the 2004 program participation agreement. But like his criticism of Ross, Gillespie's criticism of Kerber's job performance lacks the appropriate context.

Context matters. Kerber testified that when he signed the 2004 program participation agreement, he relied on the opinions of his subordinates, including those charged with compliance, and had no reason to believe that Kaplan's policies violated the Rehabilitation Act or its implementing regulations. And while he did not independently review the agreement or specifically review Kaplan's policies for compliance with the Rehabilitation Act, Kaplan had hired "the kind of people

39

that had integrity, that had experience, [and] that had knowledge"; the company also used a system where there were "experts who ran the departments," and they were responsible for ensuring Kaplan's compliance.  Even so, Kerber knew that Kaplan was required to comply with the Rehabilitation Act, and he testified that Kaplan was "very on board with meeting those requirements."  He also knew that Kaplan's obligation to comply with the program participation agreement was ongoing and that failure to do so could result in the loss of eligibility to receive Title IV funds.

In short, Kerber did not sign the 2004 program participation agreement willy-nilly but rather in reliance upon the work of his subordinates.  Gillespie has adduced no evidence—either in the district court or on appeal—suggesting (much less showing) that Kerber's reliance on his subordinates was unreasonable under the circumstances.  But even if he had, summary judgment would still have been proper unless a reasonable jury could conclude that Kerber's reliance amounted to gross negligence under the circumstances.  *See King-Vassel*, 728 F.3d at 712–13.  Given Gillespie's lack of evidence and Kaplan's robust compliance system that relies upon multiple employees as well as the independent advice of outside counsel, we conclude that Gillespie's attempt to create a jury question by cherry-picking Kerber's testimony is unavailing.

Here, the undisputed facts show that Kaplan took compliance with the Rehabilitation Act and its implementing regulations seriously: it assigned Ross, an employment lawyer with over twenty years' experience, to revise its nondiscrimination policies and grievance procedures in 2003; it based these

40

revisions on policies that had been approved by the EEOC; it regularly held compliance training for its employees; and it hired outside counsel to review its training materials.  These actions contradict Gillespie's contention that Kaplan's compliance certification was made with reckless disregard for the truth.  *Cf. United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) (holding that the company "demonstrated" its "lack of recklessness" by devoting considerable resources to compliance); *United States v. Renal Care Grp., Inc.*, 696 F.3d 518, 531 (6th Cir. 2012) (concluding that defendants demonstrated a lack of scienter by "consistently s[eeking] clarification on the issue" and "follow[ing] industry practice in trying to sort through ambiguous regulations").

Given this undisputed evidence, we conclude that the district court did not err by granting summary judgment to Kaplan.

### iii.  Kaplan "Judicial Admissions" of Noncompliance

Finally, Gillespie contends that summary judgment was inappropriate because Kaplan voluntarily entered into a restoration agreement with the OCR, which was only possible if the company had been found to violate the regulations that the agency enforced.  But even if it were true that the seven defects listed in the OCR's October 2005 letter to Kaplan constituted violations of the Department of Education's regulations implementing section 504 of the Rehabilitation Act, *see* 34 C.F.R. §§ 104.7(b), 108, and that Kaplan admitted to these violations by entering into the restoration agreement, these facts alone would not permit a rational jury to find that Kaplan's compliance certification in the 2004 program

41

participation agreement was made with the requisite scienter.  Accordingly, we conclude that Gillespie's final contention fails to show that the district court erred in granting summary judgment to Kaplan.

## 2.  The Timing of Summary Judgment

Gillespie offers another reason to reverse the district court's grant of summary judgment to Kaplan: the ruling was premature given that Kaplan had been ordered to produce four documents wrongly withheld as privileged just two business days before.  According to Gillespie, the district court failed to appreciate the importance of these documents because he had no opportunity to "put them into [the] appropriate context."  This is untrue.

In his motion to abate, for example, Gillespie contended that three of the four documents "could have potentially led [him] to alert the [c]ourt that further discovery may impact the pending summary judgment briefing."  In response, Kaplan attached each referenced document to its opposition brief.  Yet Gillespie's reply brief—like his brief on appeal—provided no "context" explaining how these documents suggest that Kaplan acted with the requisite scienter.[16]  Put simply, Gillespie had several chances to place the documents in their appropriate context; he simply failed to avail himself of them.  In addition to this shortcoming,

---

[16] On appeal, Gillespie claims that the district court "misapprehended the law and the facts" because one of these documents "provides unquestionable proof that Kaplan remained in knowing, actual violation of Section 504, even as late as March 2007, to wit: a copy of Kaplan University's revised university handbook."  But as with many of his other arguments, he never explains how this draft course catalogue "provides unquestionable proof" of scienter.  Nor is it obvious to us how it does.

Gillespie's contention has an even more fundamental defect: he never advised the district court that he had asked the magistrate judge to review about 60 documents (from Kaplan's 124-page privilege log) to determine whether they had been improperly designated as privileged.  This dooms his contention.

We have held that "the party opposing the motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery."  *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 871 (11th Cir. 1988).  "Courts cannot read minds," so the nonmoving party must give more than "vague assertions that additional discovery will produce needed, but unspecified, facts."  *Reflectone, Inc.*, 862 F.2d at 844; *id.* at 843 (quoting *Wallace*, 703 F.2d at 527) (internal quotation mark omitted).  Indeed, as the party opposing summary judgment, Gillespie had to "specifically demonstrate" how postponing the court's ruling would have enabled him, "by discovery or other means, to rebut [Kaplan's] showing of the absence of a genuine issue of fact" on scienter.  *Id.* at 843 (*Wallace*, 703 F.2d at 527) (internal quotation mark omitted).

Yet Gillespie never notified the district court about the discovery dispute. He did not submit to the court a Rule 56(d) notice, affidavit, or anything of the kind.  Nor did he reference the allegedly outstanding discovery in his opposition to summary judgment—let alone explain to the district court how the outstanding discovery would have enabled him to show that a jury question on scienter remained.  To justify his failure to notify the district court, Gillespie emphasizes the time between when Kaplan was ordered to produce the wrongly withheld documents and when the court ruled on the parties' cross-motions for summary

43

judgment.  He says that he did not have a chance to notify the court about the potential value of this evidence during the two business days between these rulings.  But the record belies his assertion.

Gillespie's oral request for *in camera* review and full briefing on the discovery dispute had been complete for more than two weeks when Kaplan filed its motion for summary judgment—and for more than a month when Gillespie filed his opposition to summary judgment.  Thus, he had many opportunities to explain to the district court the effect that the allegedly outstanding discovery might have had on the motions for summary judgment.  And there is no merit to his contention that the district court should have waited to rule on these motions because it was "aware" that the discovery dispute was pending on the docket.  Awareness alone is not enough, however.  Gillespie needed to specifically alert the court that he needed the then-outstanding discovery in order to properly oppose Kaplan's motion for summary judgment.  Because it is undisputed that he did not, we conclude that the district court did not abuse its discretion by ruling on the parties' cross-motions for summary judgment two business days after Kaplan was ordered to produce four wrongly withheld documents.[17]

---

[17] Gillespie also contends that his failure to direct the district court's attention to the outstanding discovery is "moot" because the court admitted that it had read the documents "before granting summary judgment."  Not so.  The record is clear that the district court reviewed these documents *after* it granted summary judgment to Kaplan, and then only to confirm that Gillespie's motions for abatement and reconsideration were baseless.

44

## V. Conclusion

For the reasons stated above, we affirm the district court's dismissal of Diaz's claims against Kaplan that were based on its alleged violations of the Department of Education's satisfactory-progress regulation, 34 C.F.R. § 668.34; the 90/10 rule, 20 U.S.C. § 1094(a)(24), (d)(2); and the accreditation requirement, 34 C.F.R. § 600.5(a)(6).  But we modify the judgment of dismissal to be without prejudice with respect to the government.  We reverse the district court's dismissal of Diaz's claims against Kaplan to the extent that they were based on its alleged violation of the incentive-compensation ban, 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(ii), and remand the case for further proceedings consistent with this opinion.

We affirm the district court's grant of summary judgment to Kaplan on all of Gillespie's claims.

AFFIRMED in part, REVERSED in part, MODIFIED in part, and REMANDED.

45