[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10500
_____

D.C. Docket No. 8:11-cv-01303-SDM-TBM


ANGELA RUCKH,
Relator,

                                        Plaintiff – Appellant,

versus

SALUS REHABILITATION, LLC,
d.b.a. La Vie Rehab,
207 MARSHALL DRIVE OPERATIONS, LLC,
d.b.a. Marshall Health and Rehabilitation Center, et al.,

                                        Defendants – Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 25, 2020)

Before BRANCH and MARCUS, Circuit Judges, and UNGARO,[*] District Judge.

_____

[*] Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

UNGARO, District Judge:

Relator Angela Ruckh, a registered nurse, brought this *qui tam* action alleging violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.* (the "Florida FCA"), against two skilled nursing home facilities, two related entities that provided management services at those and 51 other facilities in the state, and an affiliated company that provided rehabilitation services.  The relator appeals the district court's grant, after jury trial, of the defendants' renewed motion for judgment as a matter of law or, in the alternative, for a new trial.

The jury found the defendants liable for the submission of 420 fraudulent Medicare claims and 26 fraudulent Medicaid claims and awarded $115,137,095 in damages.  After applying statutory trebling and penalties, the district court entered judgment in favor of the relator, the United States, and the State of Florida in the total amount of $347,864,285.  After judgment was entered, the defendants timely renewed their motion for judgment as a matter of law or, in the alternative, for a new trial.  The district court ultimately set aside the jury's verdict as unsupported by the evidence and granted judgment as a matter of law.  In the alternative, the district court conditionally granted the defendants' request for a new trial.

After thorough consideration, and with the benefit of oral argument, we affirm in part and reverse in part.  We remand with instructions for the district

court to reinstate the jury's verdict in favor of the relator, the United States, and the State of Florida and against the defendants on the Medicare claims in the amount of $85,137,095, and to enter judgment on those claims after applying trebling and statutory penalties.

I.

We begin with an overview of the Medicare and Medicaid programs in the skilled nursing home context, the relevant statutory and regulatory requirements that skilled nursing facilities, like the defendants, must satisfy to obtain Medicare and Medicaid reimbursement, and the consequences for failing to comply with these requirements.

The Medicare Program

The Social Security Amendments of 1965 established the Medicare program, which provides federally funded health insurance to eligible elderly and disabled persons.  *See* 42 U.S.C. §§ 1395 *et seq.*  Medicare Part A pays skilled nursing facilities, or "SNFs," a daily rate for the routine services they provide to each resident.  42 U.S.C. § 1395yy; 42 C.F.R. § 413.335.  Medicare bases its payment amount in part on information provided to it by SNFs.  42 C.F.R. § 413.343.  Specifically, Medicare requires SNFs to "conduct initially and periodically a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity."  *Id.* § 483.20; *see also* 42 U.S.C. § 1395i-

3(b)(3). The assessments must be made using the resident assessment instrument ("RAI") specified by Centers for Medicare & Medicaid Services ("CMS") and must address several factors, including each resident's cognitive patterns, psychological well-being, disease diagnoses and health conditions, medications, and special treatments or procedures. 42 C.F.R. § 483.20(b)(1).

Medicare regulations require SNFs to complete these evaluations, known as Minimum Data Set ("MDS") assessments, at regular intervals.[1] 42 U.S.C. § 1395i-3(b)(3)(C); 42 C.F.R. §§ 413.343, 483.20(b)(2). The final day of the assessment interval is referred to as the "assessment reference date," or "ARD." Medicare's assessment schedule includes 5-day, 14-day, 30-day, 60-day, and 90-day scheduled assessments. The assessment looks back over a 7-day period, and Medicare also reserves for the SNFs a grace period during which SNFs have discretion to set the precise ARD.

MDS assessments are designed to be comprehensive, accurate, standardized, and reproducible. *See* 42 U.S.C. § 1395i-3(b)(3)(A); 42 C.F.R. § 483.20(g). Each assessment must be conducted or coordinated and certified as complete by a registered professional nurse ("RN"). 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1). Each individual who completes a portion of the assessment

---

[1] Failure to comply with the assessment schedule carries consequences: "CMS pays a default rate for the Federal rate . . . for the days of a patient's care for which the SNF is not in compliance with the assessment schedule." 42 C.F.R. § 413.343(c).

must sign and certify the accuracy of that portion. 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(2). RNs are guided in completing the assessments by the Resident Assessment Instrument Manual ("RAI Manual"), which is promulgated and regularly updated by CMS. The RAI Manual facilitates accurate, effective, and uniform resident assessment practices by SNFs and fosters a holistic approach to optimizing resident care, well-being, and outcomes.

The accuracy of MDS assessments is critical because under the Resource Utilization Group ("RUG") model, which governed at the time of this lawsuit, CMS tied the amount of its payments to SNFs in part to RUG codes derived from MDS assessments.[2] Medicare used SNFs' self-reported RUG codes during assessment periods to set payment rates on a forward-looking basis, and the RUG codes governed payment until the next assessment period. The RUG codes were divided among eight classification groups. The relevant RUG codes began with the letter "R," as they were classified as rehabilitation services. The RUG codes were further divided based on each resident's "activities of daily living" ("ADL") needs. Residents with more specialized nursing needs and with greater ADL dependency were assigned to higher groups in the RUG hierarchy. Because

---

[2] In October 2019, CMS shifted from the RUG model to a patient-driven payment model. *See* Ctrs. for Medicare & Medicaid Servs., Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual ch. 6-2 (Oct. 2019), https://downloads.cms.gov/files/mds-3.0-rai-manual-v1.17.1_october_2019.pdf. Our opinion in this appeal is limited to the RUG model, which governed at the time of this lawsuit.

5

providing care to these residents was more costly, CMS reimbursed SNFs for this care at a higher daily rate.  *See* Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities, 63 Fed. Reg. 26252, 26261–65 (May 12, 1998).  The second letter of the RUG codes reflected the number of minutes of therapy services provided to residents, and the third letter indicated the level of nursing assistance provided to the residents.  Therapy codes ranged from "Low" ("L") to "Ultra High" ("U").  Nursing codes "A," "B," and "C" generally reflected increasing levels of nursing services and greater ADL dependency, with additional codes "L" and "X" reflecting more extensive services.

To receive Medicare reimbursement, SNFs must electronically transmit the MDS assessment to CMS within 14 days of completing it.  42 C.F.R. § 483.20(f)(3).

The Medicaid Program

The Social Security Amendments of 1965 established the Medicaid program.  *See* 42 U.S.C. §§ 1396 *et seq.*  Medicaid, which is jointly financed by the federal and state governments and administered by the states, helps states provide medical assistance to low-income persons.  42 C.F.R. § 430.0.  States pay service providers directly, subject to broad federal rules, and receive partial reimbursement from the federal government for their Medicaid expenses.  *Id.*; 42 U.S.C. §§ 1396b(a), 1396d(b).  Unlike Medicare's fee-for-service model, Florida

6

Medicaid reimburses SNFs for resident care at a flat daily rate.  *See* Fla. Stat. § 409.908(1)(f).

Under Florida's Medicaid program, SNFs are required to present claims that "[a]re documented by records made at the time the goods or services were provided, demonstrating the medical necessity for the goods or services rendered." Fla. Stat. § 409.913(7)(f).  "Medicaid goods or services are excessive or not medically necessary unless both the medical basis and the specific need for them are fully and properly documented in the recipient's medical record."  *Id.*

SNFs are required by federal law and Florida administrative law to "provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care."  42 U.S.C. § 1396r(b)(2); *see also* Fla. Admin. Code Ann. r. 59A-4.109(2). The written plan of care must:

> (A) describe[] the medical, nursing, and psychosocial needs of the resident and how such needs will be met;
>
> (B) [be] initially prepared, with the participation to the extent practicable of the resident or the resident's family or legal representative, by a team which includes the resident's attending physician and a registered professional nurse with responsibility for the resident; and
>
> (C) [be] periodically reviewed and revised by such team after each assessment under paragraph (3).

42 U.S.C. § 1396r(b)(2); *see also* Fla. Admin. Code Ann. r. 59A-4.109(2)

(requiring SNFs to develop a "comprehensive care plan for each resident").

The Florida Medicaid Nursing Facility Services Coverage and Limitations

Handbook, with which SNFs must comply under Florida's Medicaid regulations,

elaborates on this requirement.  *See* Fla. Admin. Code Ann. r. 59G-4.200 (July 23,

2006).  This handbook states that SNFs are "responsible for developing a

comprehensive plan of care for each resident."  It further states that the care plan is

to be developed based on resident evaluations conducted in connection with the

MDS assessment process.  Additionally, the Florida Medicaid Provider General

Handbook puts SNFs on notice that "Medicaid payments for services that lack

required documentation or appropriate signatures will be recouped."  *See also* Fla.

Admin. Code Ann. r. 59G-5.020 (requiring compliance with the Florida Medicaid

Provider General Handbook).  It cautions that providers are responsible for

presenting claims that are "true and accurate" and that are for "goods and services"

that "[a]re provided in accord with applicable provisions of all Medicaid rules,

regulations, handbooks, and policies and in accordance with federal, state and local

law."

Florida's Medicaid regulations require SNFs to submit billing forms known

as UB-04s to receive Medicaid reimbursement.  *See* Fla. Admin. Code Ann. r.

59G-4.003.  The back of the UB-04 contains several representations, including:

• The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).

• Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

• For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

Procedural History

The relator, Ruckh, is a registered nurse certified in preparing MDS assessments. From January 2011 until May 2011, she worked at Marshall Health and Rehabilitation Center ("Marshall") and Governor's Creek Health and Rehabilitation Center ("Governor's Creek") as an interim MDS coordinator preparing RUG assessments. She claimed that over the course of these five months, she discovered that the defendants were misrepresenting the services they provided to Medicare beneficiaries and failing to comply with certain Medicaid requirements in three ways: first, the defendants routinely engaged in "upcoding," or the artificial inflation of RUG codes; second, the defendants engaged in "ramping," or the timing of spikes in treatment to coincide with the ARD, which

9

exaggerated the required payment levels; and third, the defendants submitted claims for Medicaid reimbursement without creating or maintaining comprehensive care plans.

On June 10, 2011, Ruckh filed suit against five defendants: (i) Sea Crest Health Care Management, LLC, which did business under the name La Vie Management Services of Florida ("LVMSF"); (ii) CMC II, LLC, LVMSF's successor-in-interest (together with LVMSF, "La Vie Management"); (iii) Salus Rehabilitation, LLC, which provided rehabilitation therapy services at Marshall; (iv) 207 Marshall Drive Operations, LLC, which did business under the name Marshall Health and Rehabilitation Center; and (v) 803 Oak Street Operations, LLC, which did business under the name Governor's Creek Health and Rehabilitation Center.  La Vie Management provided management services to a network of 53 SNFs throughout Florida, including Marshall and Governor's Creek.

In the *qui tam* complaint, Ruckh alleged that the defendants violated 31 U.S.C. § 3729(a)(1)(A), (B), and (G), along with parallel provisions of the Florida FCA.  The FCA subjects to liability any person who, in relevant part:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
>
> . . . .

10

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(l)(A)–(B), (G).[3]

After both the United States and the State of Florida declined to intervene, Ruckh prosecuted the action on her own as a *qui tam* relator. On January 17, 2017, following several years of motions and discovery, the case proceeded to a month-long trial.

At the conclusion of the relator's case-in-chief, the defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which the district court denied. The defendants raised four grounds in support of their motion: first, the relator failed to prove a corporate scheme to knowingly cause the submission of false claims; second, the relator failed to present sufficient evidence of materiality as to the allegedly fraudulent Medicaid claims; third, the relator

---

[3] The term "claim" includes "direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. _ _ _ _, 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348, 358 (2016) (citing § 3729(b)(2)(A)). The statute specifies that a person acts "knowingly" with respect to information when she has "actual knowledge," "acts in deliberate ignorance of the truth or falsity," or "acts in reckless disregard of the truth or falsity" of the information. 31 U.S.C. § 3729(b)(l)(A). The statute further defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

11

failed to present sufficient evidence of materiality and scienter as to the allegedly fraudulent Medicare claims; and fourth, the relator's use of statistical sampling and extrapolation to establish damages was impermissible.

On February 13, 2017, the case was submitted to the jury. After two days of deliberation, the jury returned its verdict finding the defendants liable under § 3729(a)(1)(A) and (B) for the submission of 420 fraudulent Medicare claims and 26 fraudulent Medicaid claims and awarded $115,137,095 in damages.[4,5] After trebling and the application of statutory penalties, the district court entered judgment in favor of the relator, the United States, and the State of Florida totaling $347,864,285.

On March 29, 2017, following entry of judgment, the defendants renewed their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Defendants advanced three arguments in support of their motion: first, that

---

[4] The jury also found the defendants liable under § 3729(a)(1)(G) but calculated damages as $0. The jury's finding in this regard is not before this Court on appeal.

[5] The district court, in its order, did not address whether the methodology employed by the relator's expert to calculate damages was flawed either because the sample size was too small or improvidently drawn and the defendants have abandoned any argument regarding the admission of the expert testimony on appeal. "[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012) (quoting *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004)). Accordingly, we do not address whether the sampling method and extrapolation employed by the relator's expert was reliable and otherwise admissible pursuant to Federal Rule of Evidence 701 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

the alleged Medicaid-related fraud was unsupported by evidence of materiality; second, that the relator failed to prove the materiality of the alleged Medicare-related fraud; and third, that no evidence supported any allegation of fraud on the part of La Vie Management.  In the alternative, the defendants moved the court to grant a new trial, arguing the verdict was "excessive and against the weight of the evidence."  In the event the court viewed a new trial as unnecessary, the defendants alternatively sought remittitur.

On January 11, 2018, the district court granted the motion for judgment as a matter of law and set aside the jury's verdict.  In the alternative, the district court conditionally granted the defendants' request for a new trial and denied the request for remittitur as moot.  In granting the defendants' motion for judgment as a matter of law, the district court relied mainly on its assessment that the relator failed to introduce evidence of materiality and scienter at trial.  The district court held that "the relator failed to offer competent evidence that defendants knew that the governments regarded the disputed practices as material" and would have refused to pay the claims had they known about the disputed practices.  The district court concluded that the evidence was insufficient to support any theory of FCA liability against La Vie Management, as the evidence did not show that the management entity "presented" or "caused to be presented" a false claim or "produced" or "caused the production" of a "'false record or statement' material to a false claim."

13

As to the existence of a "corporate scheme," the district court agreed with the defendants that "the relator fail[ed] entirely to connect the testimony about 'RUG budgets,' 'LaVie meetings,' and 'corporate profits' to any particular claim 'actually submitted' to the government." In alternatively granting the defendants' motion for a new trial, the district court did not explain its reasoning except to state that it was conditionally granted "for the reasons explained above and for the reasons identified and satisfactorily explained in the defendants' motion."

The relator filed the instant appeal on February 8, 2018. Before the parties submitted their respective briefs on the merits, the defendants moved to dismiss the appeal for lack of jurisdiction. The defendants' motion to dismiss this appeal was carried with the case. We deny the motion to dismiss. We affirm as to the Medicaid claims. We reverse as to the Medicare claims and remand with instructions for the district court to reinstate the jury's verdict on those claims.

## II.

"[T]he decision to grant or deny a motion to dismiss is within the discretion of the Court of Appeals." *Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n*, 895 F.2d 711, 713 (11th Cir. 1990) (quoting *Brookhaven Landscape & Grading Co. v. J. F. Barton Contracting Co.*, 681 F.2d 734, 736 (11th Cir. 1982)).

"We review de novo a district judge's granting judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and apply the same standard as the trial judge.  In reviewing the record evidence, we draw all inferences in favor of the nonmoving party." *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1121 (11th Cir. 2016) (citing *Collado v. United Parcel Serv.*, *Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005)).  "In considering a Rule 50(b) motion after the jury verdict, 'only the sufficiency of the evidence matters. The jury's findings are irrelevant.'" *Id.* (quoting *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014)).  "Judgment as a matter of law for a defendant is appropriate, 'when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim.'" *Id.* (quoting *Collado*, 419 F.3d at 1149); *see also Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1344–45 (11th Cir. 2000) ("A Rule 50(b) motion should only be granted where reasonable jurors could not arrive at a contrary verdict." (citation, internal quotation marks, and alteration omitted)).

"We review the grant of a new trial pursuant to Rule 59 [of the Federal Rules of Civil Procedure] for abuse of discretion.  Our review for abuse of discretion is 'more rigorous when the basis' of the grant was the weight of the evidence." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1242 (11th Cir. 2008) (internal citation omitted) (quoting *Williams v. City of Valdosta*, 689 F.2d

964, 974 (11th Cir. 1982)).  We nevertheless give deference to "the trial court's first-hand experience of the witnesses, their demeanor and a context of the trial." *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 777 (11th Cir. 1991).  Further, the district court is allowed wide discretion when it grants a new trial and "evidentiary weight is merely one of numerous factors cited in support" thereof. *J.A. Jones Constr. Co v. Steel Erectors, Inc.*, 901 F.2d 943, 944 (11th Cir. 1990).

## III.

## A.

We first consider the defendants' claim that the relator's entry into a litigation funding agreement (the "Agreement") dated October 17, 2017 with ARUS 1705-556 LLC ("ARUS") vitiates her standing to pursue this appeal.[6]  The relator agreed to sell ARUS less than 4% of her share of the judgment originally entered by the district court, if the jury verdict were upheld on appeal, assuming a

---

[6] The relator entered into the Agreement with ARUS during the pendency of the defendants' renewed motion for judgment as a matter of law in the court below. However, the defendants discovered this financing arrangement upon reviewing the relator's Certificate of Interested Persons filed in this Court.  The Certificate of Interested Persons describes ARUS as a "privately owned limited liability company focused on litigation funding."

16

30% share to the relator.[7]  According to the relator, the Agreement is explicit that

ARUS has no power to influence or control this litigation.[8]

In moving to dismiss the present appeal, the defendants argue that the

relator's entry into the Agreement is a partial reassignment of her interest in the

action to ARUS, which precludes her from continuing as a relator and requires this

Court to dismiss her appeal.  Specifically, the defendants argue that this partial

reassignment violates the Constitution and the text and structure of the FCA.[9]  The

---

[7] The relator's counsel represented that the Agreement contains a confidentiality provision that precludes its public filing but offered to provide a copy to the Court for an *in camera* review to aid in our consideration of its relevant provisions.  At oral argument, the Court informed the parties that we would consider the Agreement only if the relator provided a copy to the defendants.  Subsequently, the relator notified the Court that it declined to share the Agreement with the defendants.  Nevertheless, at oral argument, the parties acknowledged that the Agreement assigned to ARUS less than 4% of the relator's share of the recovery. Additionally, the relator's counsel submitted a declaration attached to the response in opposition to the motion to dismiss the appeal, stating: "The Agreement is a purchase agreement for less than 4% of Relator's share of the $347 million judgment . . . , assuming Relator were to receive a 30% relator's share."

[8] The relator represents in opposition to the motion to dismiss and the relator's counsel averred in her declaration that the Agreement provides that ARUS shall not become a party to the litigation, the relator will retain sole authority over the litigation (including settlement authority), and ARUS will offer no advice, issue no instructions, and exercise no influence over the litigation.  In the motion to dismiss, the defendants argue that it is unrealistic to conclude that a relator or her counsel would give no consideration to the views of a litigation funding entity, which has powerful incentives to participate in the management of the litigation.  The defendants' position at oral argument was that even if this Court accepts as true the relator's contention that she assigned less than 4% of her share of the recovery and maintained complete control of the litigation, the partial assignment nonetheless violates the FCA.

[9] Defendants also argue that relator's entry into the litigation funding agreement violates Article II.  We decline to address the issue because it is not jurisdictional. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000) (declining to reach the validity of *qui tam* suits under Article II because it is not "a jurisdictional issue that we must resolve here").

17

defendants urge this Court to conclude that because the relator has reassigned her interest in this action, she has forfeited her standing to represent the interests of the United States.

Article III Standing

The defendants contend that the relator has forfeited standing to pursue the appeal because she no longer belongs to the class of *qui tam* plaintiffs authorized to bring suit under the FCA and, therefore, the appeal must be dismissed.  For the reasons discussed below, we find that the relator's standing is unaffected by the Agreement and that this case is justiciable.

Article III extends "'the judicial power of the United States' . . . only to 'Cases' and 'Controversies.'"  *Spokeo, Inc. v. Robins*, 578 U.S. _ _ _ _, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635, 643 (2016) (quoting U.S. Const. art. III, §§ 1, 2). The Supreme Court has explained that the doctrine of standing to sue is "rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.* (citations omitted).  "'The law of Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches' and confines the federal courts to a properly judicial role."  *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146, 185 L. Ed. 2d 264, 275 (2013)) (citations, alterations and ellipsis omitted).  To establish

standing, a plaintiff must show that: (i) she suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical"; (ii) the injury complained of is "fairly traceable to the challenged action of the defendant"; and (iii) it is "likely," not "merely speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351, 364 (1992) (quotations omitted and alterations adopted).

In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000), the Supreme Court affirmed that *qui tam* relators have Article III standing to pursue actions on behalf of the federal government. The Court held that *qui tam* relators have standing as partial assignees of the United States. *Id.* at 773. In *qui tam* actions, the injury suffered by the United States "suffices to confer standing on" the relator. *Id.* at 774.

In this case, the relator sought to remedy an injury in fact suffered by the United States fairly traceable to the defendants' conduct and likely redressable by a favorable decision under the FCA. *See Lujan*, 504 U.S. at 560–61. For us to hold that relator lacks standing would require a showing that she is no longer the assignee of the United States, or that the United States in fact suffered no injury. The defendants do not assert the latter. Instead, they argue that by entering into a

19

litigation funding agreement, the relator disqualified herself from serving as the government's assignee.

We find the defendants' argument unavailing. The relator has given only a small interest—less than 4% of her share of the potential recovery in this case—to ARUS in exchange for immediate liquidity. *Cf. Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984) (explaining that "[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor"). And, as the relator acknowledged, the Agreement is clear that the relator retains sole authority over the litigation and ARUS has no power to control or influence it. Thus, although she has now entered into the litigation funding agreement, these facts remain essentially unchanged: the relator retains sufficient interest to meet the "irreducible constitutional minimum" of standing under Article III. *Id.* at 560. Consequently, she has constitutional standing to pursue this appeal.

FCA

The defendants' position on standing is better understood as an argument that the relator cannot pursue a claim under the FCA once she has assigned even a small portion of any possible recovery to ARUS, because the litigation funding

agreement violates the text and structure of the FCA.[10]  We recognize that the

statute does not expressly authorize relators to reassign their right to represent the

interests of the United States in *qui tam* actions.  However, we are not persuaded

that the FCA proscribes such assignment.

The FCA includes a number of restrictions, including on the conduct of *qui*

*tam* actions and who may serve as a relator.  *See* 31 U.S.C. § 3730.  It does not,

however, prohibit the relator's entry into the litigation funding agreement.  Indeed,

the statute is silent as to this point.  It also does not require a court to dismiss a *qui*

*tam* action upon learning of such an agreement.  The defendants nonetheless persist

in arguing that the assignment is proscribed because the statute does not

affirmatively authorize it.

The text of 31 U.S.C. § 3730(b)(1) provides that "[a] person" may bring a

suit under the FCA.  From this general grant of power, Congress specifically

excludes a person from bringing suit in three situations: where a person serves in

the armed forces (under certain circumstances), § 3730(e)(1); where a person seeks

to sue certain government officials, § 3730(e)(2); and where the person suing was

---

[10] Courts have referred to this inquiry as one of "statutory standing."  However, the Supreme Court has cautioned against use of the phrase, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4, 134 S. Ct. 1377, 1388 n.4, 188 L. Ed. 2d 392, 404 n.4 (2014). (emphasis omitted) (quoting *Verizon Md. Inc v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43, 122 S. Ct. 1753, 1758, 152 L. Ed. 2d 871, 880 (2002)).

involved in the very fraud at issue in the claim, § 3730(d)(3).  Because the FCA "explicitly enumerates certain exceptions to a general grant of power, courts should be reluctant to imply additional exceptions in the absence of clear legislative intent to the contrary."  *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991) (citation omitted); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 107–11 (2012) (summarizing the "Negative-Implication Canon" as "[t]he expression of one thing implies the exclusion of others").

We decline to interfere in Congress's legislative prerogatives by engrafting any further limitations onto the statute; that task is appropriately left for Congress. *See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 443, 196 L. Ed. 2d 340, 349 (2016) (declining to read a mandatory dismissal rule into the statute for failure to comply with the statute's seal requirement); *United States v. Florida*, 938 F.3d 1221, 1253 (11th Cir. 2019) ("It is not our function to engraft on a statute additions which we think the legislature logically might or should have made." (Branch, J., dissenting) (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 605, 61 S. Ct. 742, 744, 85 L. Ed. 1071, 1075 (1941))).

Furthermore, we find no basis in the record suggesting that the relator has not complied with all requirements of the FCA to maintain the action and reject the defendants' characterization of ARUS as an unqualified relator.  ARUS may fail to

meet every requirement imposed by the FCA for serving as a relator, but it is Ruckh—not ARUS—who is pursuing the claim as relator. We therefore reject the defendants' contention that the relator's relationship with ARUS disqualifies her as a relator under the FCA and that dismissal is warranted.

We conclude the relator has sufficiently demonstrated she has constitutional standing and, therefore, the case or controversy requirement is satisfied. We further conclude that the relator's entry into the litigation funding agreement does not violate the FCA. Accordingly, we deny the motion to dismiss.

### B.

"The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005)); *see also McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("The [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such

acts, the provider knowingly asks the Government to pay amounts it does not owe." (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).  "Simply put, the '*sine qua non* of [an FCA] violation' is the submission of a false claim to the government."  *Urquilla-Diaz*, 780 F.3d at 1045 (quoting *Corsello*, 428 F.3d at 1012).

Our circuit has expressly adopted a false certification theory of liability under the FCA.  *See id.*  Under this theory, a defendant may be found liable for falsely certifying its compliance with applicable laws and regulations.  *Id.*  To prevail, a relator must prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Id.* (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)).

The Supreme Court upheld and clarified the contours of the implied false certification theory of liability in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. _ _ _ _, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016).  The Court first held that "the implied false certification theory can, at least in some circumstances, provide a basis for [FCA] liability."  *Escobar*, 136 S. Ct. at 1999. The Court explained that the FCA's prohibition against the submission of "false or fraudulent claims" is broad enough to "encompass[] claims that make fraudulent misrepresentations, which include certain misleading omissions."  *Id.*  "When . . . a

24

defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* Accordingly, the Court held that the implied certification theory can serve as a basis for FCA liability where at least two conditions are satisfied: (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.

The Court also addressed a second, related question: whether FCA liability attaches only if a defendant's failure to disclose noncompliance with a contractual, statutory, or regulatory provision has been expressly designated by the Government a condition of payment. *Id.* The Court declined to so cabin liability but added that only misrepresentations that are "material to the Government's payment decision" are actionable under the FCA. *Id.* at 2002. The Court further emphasized that this materiality standard is "demanding."[11] *Id.* at 2003. The concept of materiality "looks to the effect on the likely or actual behavior of the

_____

[11] The Court declined to address whether the materiality requirement under § 3729(a)(l)(A) is governed by the definition of "materiality" in § 3729(b)(4) or by common law principles. *See Escobar*, 136 S. Ct. at 2002.

25

recipient of the alleged misrepresentation." *Id.* at 2002 (internal quotation and alteration omitted). Ultimately, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 2003. The Court explained further that "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* On the other hand, the Court noted:

> [I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04.

## C.

Medicare Fraud

Drawing all inferences in favor of the relator, as we must when considering a Rule 50(b) motion, we conclude that the evidence at trial permitted a reasonable jury to find that the defendants committed Medicare-related fraud. In this case, the relator alleged that defendants defrauded Medicare through the use of two improper practices: upcoding and ramping. The Court addresses each in turn.

26

In the context of this case, upcoding involves submitting bills to Medicare with elevated RUG codes.  Evidence presented at trial indicated the defendants inflated their RUG codes in two ways.  First, the defendants exaggerated the second letter of the code, representing to Medicare that they provided a greater number of therapy minutes than were reflected in their residents' medical records.  And second, the defendants elevated the third letter of the code, indicating they provided more extensive nursing services than reflected in their residents' medical records.

Shirley Bradley is a registered nurse who testified as an expert on the relator's behalf at trial.  Bradley conducted an audit of 300 Medicare claims and 300 Medicaid claims submitted across the 53 SNFs.  Bradley's audit of the Medicare claims revealed evidence of upcoding, which fit into three categories.  First, Bradley found evidence that the number of therapy minutes that the defendants reported to the government for billing purposes was higher than those reflected in contemporaneous medical records.  Bradley concluded that in 56 of the 300 claims she reviewed, the defendants inflated the number of therapy minutes actually provided to residents.

Second, the relator alleged that the defendants inflated the nursing services they provided to residents.  Bradley found evidence that the level of nursing services that the defendants reported to Medicare was higher than those reflected in

27

contemporaneous medical records.  Bradley testified that 45 of the 300 claims she reviewed contained higher levels of nursing services than actually provided to residents.  And third, the relator alleged that the defendants billed for certain complex nursing services when contemporaneous medical records did not include any such services.  As an example, Bradley testified she reviewed the file of one patient whose claim was billed at a level reflecting extensive nursing services, but a review of the patient's medical records revealed no such services had been provided.  Based upon her audit, Bradley testified that 50 of the 300 claims she reviewed included this type of extensive nursing services upcoding.

Contrary to the district court's decision, these types of affirmative misrepresentations are material.  At the time, Medicare reimbursement rates were tied in part to RUG codes.  The district court dismissed the relator's upcoding theory as "a handful of paperwork defects."  That characterization misses the mark. The defendants' theory at trial was that the RUG codes were accurate and that the entries in the corresponding patient files supporting the RUG codes were either missing or never recorded essentially due to clerical error, and that is the type of recordkeeping mistake the FCA does not punish.  But the jury was not required to believe the defendants' position.  Rather, a jury could reasonably find mistake to be an implausible explanation for the defendants' upcoding.

At its core, the concept of upcoding is a simple and direct theory of fraud. SNFs receive money from Medicare based on the services they provide. In this case, the SNFs indicated they had provided more services—in quantity and quality—than they, in fact, provided. Therefore, Medicare paid the SNFs higher amounts than they were truly owed. This plain and obvious materiality went to the heart of the SNFs' ability to obtain reimbursement from Medicare.

Like upcoding, ramping presents a fairly straightforward case. Ramping is the impermissible, artificial timing of services to coincide with Medicare's regularly scheduled assessment periods and thereby maximize reimbursements. Because Medicare uses the level of services provided during the assessment reference period to set reimbursement levels on a forward-looking basis, it is possible for SNFs to manipulate this system by providing more extensive services during the look-back period than medically necessary to address patients' needs. An SNF thereby causes Medicare to reimburse at a higher level than it would had the SNF reported the appropriate level of services. Like upcoding, ramping is material, as it goes to the essence of the parties' economic relationship.

We find that the relator presented sufficient evidence to permit a jury to conclude that the defendants engaged in ramping. At trial, the relator testified that she personally witnessed ramping while working at Marshall and Governor's Creek. For instance, she testified that she was transferred to Governor's Creek

because she brought up ramping at Marshall by "complaining about the grace days being used on every single assessment and that the patients weren't getting therapy after the [ARDs] or the MDS." Moreover, Bradley testified that she found 112 instances of ramping in her audit. Bradley explained the case of one patient, Jean H., in which the defendants billed Medicare for providing the Ultra High level of therapy. Bradley explained that in each week used to set the payment level, the defendants reported providing the patient with 720 minutes of therapy—the minimum amount needed to qualify for the Ultra High level. Bradley further noted that in the weeks between assessment periods, the patient routinely received far fewer than 720 minutes of therapy. In addition, La Vie Management's former chief compliance officer, Stephanie Griffin, confirmed through video testimony at trial that an SNF is not allowed to engage in the practice of ramping: "If you're asking me if you can manipulate grace days in order to maximize reimbursement, that is not allowed. But it's not allowed anywhere in the system. It's not just about grace days, it's any manipulation of a particular aspect of coding and billing that the sole purpose of, unrelated to care, is to impact reimbursement is a problem."

In sum, drawing all inferences in favor of the relator's testimony, as we must, a jury could reasonably conclude the defendants engaged in ramping. And ramping is material, as it directly affects the payments Medicare makes to SNFs.

Had the defendants provided only the necessary services to their residents during assessment windows, Medicare would have reimbursed the defendants at a lower level. Instead, the defendants artificially and impermissibly inflated the level of services they provided. Medicare, therefore, paid the defendants more for their services than it owed.

La Vie Management's Liability as to Medicare Fraud

Lastly, the Court addresses the relator's separate contention that the district court erred in concluding as a matter of law that she failed to establish liability with respect to La Vie Management, the entity that provided management services to the defendant facilities.

"To prevail on an FCA claim, the plaintiff must prove that the defendant (1) made a false statement, (2) with scienter, (3) that was material, (4) causing the Government to make a payment." *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019) (citing *Urquilla-Diaz*, 780 F.3d at 1045). Section 3729(a)(1)(A) prohibits knowingly presenting or causing to be presented a false claim. This creates two theories of liability: (1) a presentment theory and (2) a cause to be presented theory.

At trial, the jury returned a general verdict that La Vie Management knowingly presented or caused to be presented false and fraudulent claims to Medicare. The district court disagreed, citing the absence of any evidence that La

31

Vie Management submitted any claims at all and insufficient evidence to establish the type of "massive, authorized, cohesive, concerted, enduring, top-down" corporate scheme necessary to show that La Vie Management caused the presentation of false Medicare claims.  We understand from its words that the district court found the relator's proof lacking as to scienter and causation under either theory.  Because on appeal relator argues only that the evidence was sufficient to establish that La Vie Management caused the presentment of false Medicare claims, we confine our discussion to the sufficiency of the evidence in respect of the "cause to be presented" theory.

We begin by noting that this Court has not previously addressed the appropriate standard to prove causation in FCA "cause to be presented" actions. Relator points to two persuasive precedents which use traditional proximate cause tests: *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006) (adopting a proximate cause test "to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim to support liability under the FCA"), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 203 L. Ed. 2d 791 (2019), and *United States ex rel. Schiff v. Marder*, 208 F. Supp. 3d 1296, 1312 (S.D. Fla. 2016) (noting that "courts have applied traditional concepts of proximate causation to determine whether there is a

sufficient nexus between the Defendants' conduct and the ultimate presentation of the allegedly false claim") (internal quotation omitted).

We find that for "cause to be presented" claims, proximate causation is a useful and appropriate standard by which to determine whether there is a sufficient nexus between the defendant's conduct and the submission of a false claim. It has the advantage of familiarity and serves to cull those claims with only attenuated links between the defendant's conduct and the presentation of the false claim. "Under this analysis, a defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Marder*, 208 F. Supp. 3d at 1312-13. (internal quotation and alteration omitted).

We find that the relator introduced sufficient evidence to permit a jury to reasonably conclude that La Vie Management caused the submission of false claims. For example, Pamela Horn, a former investigator with the State of Florida, testified to a conversation she had with Carolyn Packer, another registered nurse who worked at Governor's Creek:

> Q: And did Ms. Packer say anything about what [Lee] Juliano [La Vie Management's regional reimbursement specialist] did with the RUG rate information that she received?

33

A: Yes, sir.

Q: What did she say?

A: Ms. Juliano reported that to her boss at corporate.

Q: And did Ms. Packer indicate what this all came down to, this focus on the RUG levels?

A: Yes, sir.

Q: What did she say?

A: It was to have the RUG levels as high as possible so that the revenue, the reimbursement, was high.

The relator also introduced evidence that the defendants' employees were pressured routinely to elevate RUG scores irrespective of the services provided. The relator testified:

> Q: What was the focus of the discussion about UH RUG groups in these meetings?
>
> A: That we needed to get the RUGs higher. There was a lot of criticism of the rehab director. Every day he would read off the minutes that he delivered to the patient the previous day. He would have a lot of criticism from the administrator and the business office manager. And the goal was always the 720 minutes for the date of the MDS assessment, when it was due, so that the patient would be a rehab ultra.
>
> Q: And in these -- in these daily meetings, was there any discussion about financial targets and financial goals?
>
> A: Yes, they had a Medicare budget, a RUG budget, and so it must be met or exceeded and you were criticized if

34

it wasn't and you were pretty much directed to make that happen.

Q: Were these RUG budgets that were set by the company or by the patients, the residents?

A: They were RUG budgets set by the company. I guess, you know -- yeah, without any clinical knowledge of the patient whatsoever.

The relator further testified that La Vie Management would reprimand employees constantly for failing to meet RUG budgets. The relator explained that the focus of weekly calls with La Vie Management, including regional coordinators for multiple facilities including Marshall and Governor's Creek, was on "[r]ehab ultra opportunities, how to get the RUGs higher, criticism if you weren't meeting or exceeding their RUG budget for the facility, criticism if you weren't, but really praising the facilities that were above budget for their region." Moreover, the relator introduced into evidence a La Vie Management presentation to SNFs that referred to its one goal as "RUG enhancement" and indicated that the employees should focus on "maximizing therapy minutes." The evidence also suggested La Vie Management had a policy of prohibiting the submission of claims at the lowest RUG code without management approval.

In light of this evidence, a jury could reasonably conclude that La Vie Management's conduct was "(l) a substantial factor in inducing providers to submit claims for reimbursement," and that (2) "the submission of claims for

35

reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Id.* at 1313 (internal quotation and alteration omitted).

This same evidence supports an inference that La Vie Management acted knowingly. The scienter requirement in FCA actions is rigorous and must be strictly enforced. *See Escobar*, 136 S. Ct. at 2002. Under the rigorous standard, the evidence reasonably permitted the jury to conclude that La Vie Management acted knowingly under the FCA.

Therefore, with respect to the allegations of Medicare fraud, we conclude that the relator presented sufficient evidence to permit a reasonable jury to conclude that the defendants violated the FCA when they submitted the claims. Further, we find that the district court erred in holding that La Vie Management did not cause the submission of false claims. Accordingly, we reverse the district court's grant of judgment as a matter of law to the defendants as to the Medicare-related fraud claims.

Medicaid Fraud

For the reasons discussed below, we hold that the district court correctly granted the defendants' motion for judgment as a matter of law as to the alleged false Medicaid claims. Specifically, we conclude that based on the evidence presented at trial, no jury could have reasonably concluded that the defendants defrauded Medicaid.

At trial, the relator introduced evidence that the defendants routinely submitted claims for Medicaid reimbursement without preparing and maintaining comprehensive care plans. The relator testified that while working at Governor's Creek and Marshall, there were few, if any, care plans in the patient files. An email introduced into evidence from Juliano confirmed care plans were "a mess." And Bradley testified her audit revealed missing care plans for approximately 52 residents.

The relator's sole allegation as to Medicaid fraud consists of the defendants' failure to prepare and maintain comprehensive care plans for their residents. Even if we accept this allegation as true, we hold that the failure to do so cannot establish Medicaid fraud as a matter of law. Under *Escobar*, the relator was required to prove not only that the defendants failed to comply with this requirement, but that their failure to do so was material. Again, this materiality standard sets a "demanding" bar. *Escobar*, 136 S. Ct. at 2003.

The relator contends she met the standard, pointing to evidence at trial that indicated Florida would or could automatically deny payment if the state were to discover care plans are missing. The district court rejected this argument and granted judgment as a matter of law because the relator did not introduce evidence that the state in fact declines to pay claims when it learns SNFs have failed to prepare and maintain comprehensive care plans. We note that the relator

37

introduced evidence at trial of the opposite.  The relator testified that when she informed her direct supervisors at La Vie Management that her patient files lacked care plans, they self-reported the deficiencies to the state.  There was no evidence, however, that the state refused reimbursement or sought recoupment after this self-reporting.  And there was no evidence that the state ever declines payment for, or otherwise enforces, these types of violations.  As the Supreme Court stated in *Escobar*, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  *Id.* at 2003–04.

We acknowledge that the absence of evidence that the state declines payment when an SNF fails to comply with the care plans requirement, alone, is not fatal to the relator's case.  Rather, this evidence is a useful, but not necessary, indicator of materiality.  *See id.* (describing evidence of materiality but noting evidence need not be limited to the examples given).  However, we find in this case that the relator's scant evidence supported only the conclusion that care plans are, at most, labeled as conditions of payment under Medicaid regulations.  This evidence, without more, is insufficient to establish materiality.  Thus, we agree with the district court's conclusion that the relator failed to prove the materiality of the absence of care plans.

Additionally, we conclude that the lack of care plans fails to establish Medicaid fraud for an entirely separate reason under the analysis in *Escobar*. The relator relied on the implied certification theory of liability in alleging Medicaid fraud. That theory can support a jury verdict only where the relevant claim not only requests payment but also "makes specific representations about the goods or services provided." *Id.* at 2001. Here, the relator failed to connect the absence of care plans to specific representations regarding the services provided. Moreover, the relator did not allege, let alone prove, any deficiencies in the Medicaid services provided.

Without more, the failure to create and maintain care plans cannot serve as a basis for FCA liability. The FCA is not a wide-ranging tool to combat failures to comply with even important government regulations. *See Clausen*, 290 F.3d at 1311 ("[W]hile the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the [FCA]."); *see also Escobar*, 136 S. Ct. at 2003 ("The [FCA] is not an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." (internal quotation omitted)).[12]

---

[12] In arguing that the district court erred in granting the defendants' renewed motion for judgment as a matter of law, the relator also contends that the district court impermissibly considered two grounds that the defendants waived by not raising them in their Rule 50(a) motion: the sufficiency of evidence as to (1) Medicare fraud and (2) the defendants' knowledge of the materiality of their claims. Rule 50 is designed to protect a plaintiff's Seventh

E.

Because we affirm the district court's judgment as a matter of law on the Medicaid claims, we need only address the district court's grant of a conditional new trial with respect to our reversal of the judgment as a matter of law on the Medicare claims. The district judge's reasoning for granting a new trial is not evident— he wrote only that "the request for a new trial is conditionally **GRANTED** for the reasons explained above and for the reasons identified and satisfactorily explained in the defendants' motion."

---

Amendment right to cure evidentiary deficiencies before a case is submitted to the jury. *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998). To determine whether the district court improperly considered arguments waived by defendants, we compare the grounds originally argued in defendants' Rule 50(a) motion with those cited by the court in granting judgment as a matter of law. *See id.* (citing *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545 (11th Cir. 1986)). We do not require complete identity of issues; instead, we consider whether the Rule 50(a) and Rule 50(b) issues are "closely related." *Id.* Only if the old and new grounds "vary greatly" is the district court prohibited from relying on those new grounds in setting aside the jury's verdict. *Id.* (citing *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 845–46 (5th Cir. 1975)). The purpose of this waiver rule is to avoid ambush; setting aside a jury's verdict cannot come as a surprise to the non-movant. *Id.* (citing *Sharon Steel*, 781 F.2d at 1549–50).

Here, in granting the defendants' Rule 50(b) motion, the district court cited the defendants' arguments as to materiality and scienter. Since these issues are closely related to the arguments the defendants made in their Rule 50(a) motion, the relator cannot argue she has been ambushed. Further, the district court criticized the sufficiency of evidence as to materiality during the proceeding. Thus, the relator cannot argue that the district court's order came as a surprise. We therefore reject the relator's procedural waiver argument.

40

We perceive no need for a new trial on liability.[13]  Our reasons for reversing the judgment as a matter of law on the Medicare claims also support the conclusion that the jury verdict finding the defendants liable with respect to the Medicare claims was not contrary to the weight of the evidence.  *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186, 1189 (11th Cir. 2001) ("[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984))); *see also McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1257 (11th Cir. 2016) (new trial not appropriate where "the verdict was not against the clear weight of the evidence") (quotation omitted).  Having held that the relator introduced sufficient evidence to permit a reasonable jury to find the defendants liable for Medicare-related fraud, and not for Medicaid-related fraud, we hold that the district court abused its discretion in conditionally granting the defendants' request for a new trial as to liability on the Medicare claims.

Defendants contend on appeal that a new trial is appropriate because the Medicare-related damages are excessive.  We decline to entertain the defendants'

---

[13] Because the district court's order did not expressly discuss the excessiveness of the verdict, "the reasons explained above" could have referred only to the court's determination that the verdict was contrary to the weight of the evidence.

41

arguments because they are conclusory and were not adequately developed in the district court. "As a general principle, this court will not address an argument that has not been raised in the district court." *Stewart v. Dep't of Health & Human Servs.*, 26 F.3d 115, 115 (11th Cir. 1994) (citing *Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1510 (11th Cir. 1991)).[14] "The corollary of this rule is that, if a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it." *Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012) (quoting *Leonard v. Pan Am. World Airways, Inc. (In re Pan Am. World Airways, Inc., Maternity Leave Practices & Flight Attendant Weight Program Litig.)*, 905 F.2d 1457, 1462 (11th

---

[14] We have permitted issues to be raised for the first time on appeal in five limited circumstances:

> First, an appellate court will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice. Second, the rule may be relaxed where the appellant raises an objection to an order which he had no opportunity to raise at the district court level. Third, the rule does not bar consideration by the appellate court in the first instance where the interest of substantial justice is at stake. Fourth, a federal appellate court is justified in resolving an issue not passed on below . . . where the proper resolution is beyond any doubt. Finally, it may be appropriate to consider an issue first raised on appeal if that issue presents significant questions of general impact or of great public concern.

*Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1156 (11th Cir. 2018) (quoting *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004)). None of these circumstances apply to this case.

Cir. 1990)).  The defendants' argument to the district court in their Rule 50(b) motion consisted of one sentence: "The jury's single damages award of over $115 million is excessive and against the weight of the evidence in light of all the deficiencies in Relator's proof discussed above."  To the extent the defendants elaborated on their assertion, they pointed only to evidentiary deficiencies with respect to the Medicaid-related damages.  These superficial assertions were insufficient to permit reasoned consideration by the district court and were an inadequate justification for the district court's conditional grant of a new trial.

The defendants insist in their Response Brief that their one-sentence argument to the district court was sufficient to preserve on appeal the issue of the excessiveness of the Medicare-related damages because their argument "was not limited to Medicaid, although Defendants highlighted the Medicaid verdict as the '[m]ost egregious' example of this excess."  And for the first time on appeal, the defendants offer new arguments as to why the Medicare-related damages award allegedly is excessive.  However, having failed to articulate the fact-based reasons for its contentions in the district court, the defendants cannot raise them for the first time on appeal for the purpose of salvaging the erroneous decision of the district court to conditionally grant a new trial.  *See Stewart*, 26 F.3d 115 ("Judicial economy is served and prejudice is avoided by binding the parties to the facts

43

presented and the theories argued below." (quoting *Bliss v. Equitable Life Assurance Soc'y of U.S.*, 620 F.2d 65, 70 (5th Cir. 1980))).

IV.

For the foregoing reasons, the motion to dismiss is denied. We affirm in part and reverse in part the district court's grant of the defendants' renewed motion for judgment as a matter of law or, alternatively, for a new trial, and affirm in part and reverse and vacate in part the judgment. Specifically, we affirm the district court's grant of judgment notwithstanding the verdict as to the Medicaid claims. With respect to the Medicare claims, we reverse the district court's grant of judgment notwithstanding the verdict and vacate that part of its opinion. In light of our reversal on the Medicare claims, we remand with instructions for the district court to reinstate the jury's verdict in favor of the relator, the United States, and the State of Florida and against the defendants on the Medicare claims in the amount of $85,137,095, and to enter judgment on those claims after applying trebling and statutory penalties. We also reverse and vacate the district court's grant of a conditional new trial.

**AFFIRMED in part, REVERSED in part and REMANDED for reinstatement of the jury's verdict consistent with this opinion.**